## WASHINGTON RICE *vs.* GEORGE SIMMONS.

Distinction between *written* and *verbal slander.*

Any publication that tends to disgrace a man, or bring him into contempt or ridicule, is a libel.

But a degrading *imputation must appear* on the face of the libel, or by necessary inference from it.

Hence, mere scurrility and abuse, without point or specific imputation, is not actionable.

Covert slander may be explained by inuendo capable of proof.

Question reserved by the Superior Court, New Castle county, for hearing before all the judges. (See ante, p. 309.)

This was an action on the case for a *libel;* and, at the trial before the jury, on motion of the plaintiff's counsel, the following question was reserved by the court for the consideration of the Court of Errors and Appeals, to be decided in bank : whether the matter in the written paper published by the defendant in this cause, was or was not *a libel on the face of it;* which written paper was in the following words, viz : "The public are hereby cautioned against receiving from Washington Rice, or John Agness, a black man, any papers relative to my business, as sundry papers hath been purloined from my store and fell into the hands of said W. Rice, who hath endeavored to put some of them in claim against me, viz : bills and receipts for grain I had bought and paid for, which was returned to me by the holders when their crop was delivered and I paid for it." (signed) "George Simmons," (dated) "Wilmington, July 22, 1836 ;" the court having, for the purpose of trying that question in bank, charged the jury to consider the said paper as libellous on the face of it; and directed the judgment on the verdict of the jury to stand for the present, subject to the direction of the Court of Errors on that point.

This question was argued at the present term by *Wales* and *J. A. Bayard* for the plaintiff; and *R. H. Bayard* for the defendant.

*Wales.*—"A libel is a malicious publication, expressed either in printing or writing, or by signs and pictures, tending either to blacken the memory of one dead, or the reputation of one who is alive, and expose him to public hatred, contempt or ridicule." 4 *Mass. Rep.* 168, *Com.* vs. *Clapp; People* vs. *Croswell,* 2 *Wheat. Selw. N. P.,* 794; Hamilton's definition, recognized in 3 *Johns. Cases,* 354 ; 9 *Johns. Rep.* 214. " A censorious or ridiculing writing, picture or show, made with a mischievous and malicious intent towards government, magistrates or individuals." 2 *Kent. Com.* 16 ; 6 *Conn. Rep.* (*Day's*) 391 ; 1 *Bos. & Pul., Bell* vs. *Stone* 330 ; 2 *Wils.* 403, *Villers* vs. *Mous-*

*ley;* 3 *Com. Law Rep.* 353, *Browne* vs. *Croome;* (2 *Stark. Rep.* 293) 3 *Johns. Rep.* 56, *Tillotson* vs. *Cheetham;* 5 *Bin.* 219, 340, *M‘Clurg* vs. *Ross,* and *M‘Corkle, Binns; Starkie on Slander,* 126, *ch.* v. 140; 2 *Shower,* 314; (*Skinner,* 123;) 3 *Salk.* 226.    It is enough if the publication induce an ill opinion to be had of the plaintiff, or make him contemptible or ridiculous.    1 *Selewyn's N. P.* 925, *n.*

There is a broad distinction between written and spoken slander; the former being more deliberate, more permanent, more extensive, and therefore more criminal.    The publication need not appear to be libellous on the face of the paper, but may be shown to be so by evidence.    This is supported by the authorities cited.    In construing a libel the words are to be understood in the same sense in which they are understood by the public at large.    If a paper is so worded that it may be taken in a bad sense or good, it is a libel.    This paper contains abundant scandal.    Holds up Rice to the public as a base, mean, dishonest man.

What does this writing convey to the mind?    1st. That there had been a larceny of the papers, not, to be sure, by Rice, but indirectly imputing to him some connivance with those who took them; or at least of being willing to make use of them for his own advantage. A plain inference is, also, that Rice knew them to have been stolen. Again, the association of Rice with Agness, who was proved at the trial to be a very low and worthless negro, was designed and calculated to degrade and disgrace Rice.    Then, it is stated that Rice had endeavored to put in claim against Simmons receipts for grain, which had been paid off; a direct imputation of dishonesty in any man, particularly in a merchant as Rice was.    It charges Rice not merely with passive countenance or encouragement of Agness, but with active measures to defraud Simmons by the dishonest use of these papers.

*R. H. Bayard.*—In all *civil* actions for libel the publication must contain a *precise* and *clear* imputation of immoral conduct.

I contend, 1st. That there is no such imputation in this case; and, 2d. That the publication was justified, from the circumstances, for protection of the defendant against loss and injury.    As to the question of malice, it will be found to come down to this; whether the publication was or was not justified or authorized by the circumstances.

As to extraneous helps to make out the libel, they are only admissible to prove the meaning of terms ambiguous in themselves. The court are the exclusive judges of libel, or no libel.    3 *Barn. & Ald.* 503, *Wright* vs. *Clements;* 6 *Taunt.* 169, *Wood* vs. *Brown.*    And,

the question reserved is, whether the paper here set forth contains on *its face a libel.*

The radical distinction between indictments and civil actions for libels is, that the former is to punish the act because of its tendency to a breach of the peace ; in the latter, it is for compensation to the party for injury done him. *Stark. Sland.* 552 ; 4 *Taunt.* 366, *Thorley* vs. *Kerry* ; 1. *Chitty Gen. Prac.* 44 ; 3 *Wils.* 186. I admit that a distinction does exist between written and verbal slander, and that the cases go further in relation to the former ; but the courts have considered that the distinction has already been carried too far, and will not aid in extending it further. 4 *Taunt.* 366. *Mansfield*, chief justice says, he cannot perceive the reason for the distinction between written and spoken slander, though he admits it to be established. 1 *Price Exc. Rep.* 14, 15. The same dissatisfaction is expressed by all the judges. *Thompson*, justice. The old cases go so far as to establish a distinction between written and verbal slander, and that words which if merely spoken could not be actionable, may become so by being written ; and subsequent modern decisions have followed them, though with some reluctance. *Graham.* I cannot agree to extend the doctrine of words being libellous in writing which are not so in speech. It should always be shown that the words contain a libel.

The law of libel and slander was, then, originally the same. The former has been extended, apparently without reason, and the judges regretting it have determined to extend it no further. The object in both is the same ; compensation for injury ; and it is absolutely necessary in both that the slander shall contain a distinct imputation. 3 *Wils.* 186. *De Grey ;* the words must contain an express imputation of a punishable crime or misdemeanor ; and the charge upon the person spoken of must be precise. 1 *Price Exc. Rep.*, 14, 15, *Robinson* vs *Germyn, et al.*

The result of all the authorities collected by *Stark. on Slan.* (p. 140,) and cited by Mr. Wales is, that the action of slander either for verbal or written slander, extends to no more than five classes.—1st, an injury to character which must impute, in verbal slander, a crime ; in written, a specific moral offence, or want of moral feeling. 2d, an imputation affecting the person ; as of a contageous disorder. 3d, affecting a man's conduct in office. 4th, in his trade or occupation ; and 5th, cases of special damage. The publication must also be without *just* cause ; that is, where the party has the right to make the statement, it cannot be said to be malicious. A bill in chancery may contain the most flagrant imputation of moral turpitude even maliciously stated, yet is not libellous. The reason is, that the party has

the right to file such bill, and it is, therefore, not actionable. So of a petition to parliament. *Gilbert's Cases*, 180. Malice simply means the absence of just cause or right to make the statement.

The question then is, does this paper contain a libellous charge or imputation against the character of Rice; any distinct imputation of immoral conduct, or other matter tending to disgrace or degrade him? The authorities cited all contain such imputation. 1 *Bos. & Pul.*; "an infernal villain." 2 *Wils.*; "an itchy old toad," which was an imputation of a contagious disorder. So in 3 *Com. Law Rep.* the charge was of dishonestly raising funds by the bankrupt. In the argument of this case *Delany* vs. *Jones* was cited, when Lord Ellenborough said, in that case the publication did not *charge* the party with bigamy, though that was the inference sought to be raised by it.

Then is there any thing on the face of this paper which contains an imputation? If so, what is it? Mr. Wales said that it contains a degrading association with John Agness, a black man, who he says is a man of bad character. How does that appear? We are not to look beyond the paper to make out the libel. Neither does it in fact connect Rice with Agness. The paper cautioned the public against receiving certain papers either from the one or the other. There is no intimation that Rice had any connection with the stealing these papers? The paper carefully excludes this idea. It states that having been stolen, the papers had fallen into the hands of Rice, who had endeavored to put them in claim against him. Does this amount to any charge of dishonesty or immorality? These papers were receipts for grain; due bills for the price. If they were afloat uncancelled, and transferred in the course of trade, any holder had the right to put them in suit. If, therefore, they fell into the hands of Rice, the charge that he attempted to enforce payment of them, not charging him with any knowledge of their having been stolen, or even paid; and expressly excluding any idea of Rice's connection with the robbery; is no charge of any offence. In the case of such lost papers, it is obligatory on the party to publish the matter. 16 *Law Library*, 131; *Byles on Bills*, 211. This is such a caution; imputing nothing to Rice; but made to protect himself and the public against loss from receiving the papers. Then what damage can the court suppose could have resulted to Washington Rice from this publication? The case in Price shows that it is not enough that damage might *probably* arise from the charge, but its terms must show that damage would properly result from it.

*J. A. Bayard*, in reply :

The trial before the jury having decided the matter of justification

or excuse for this publication, supposing it to be a libel, the only question before the court is, whether the paper does contain a libel.

The counsel thinks he has discovered a distinction running through the cases as to the effect of a publication in reference to an indictment, and a civil action. The objects of the prosecution are different, and the punishment different: but there is no distinction in regard to what constitutes a libel, whether for the purposes of a civil action or for an indictment. Whatever is a libel is punishable either by indictment or by civil action; and a libel for the one purpose is always so for the other. In written slander it is not necessary that the libel should expressly charge a crime or precise moral offence; any publication which tends to degrade or disgrace a man, to lower him in the estimation of his fellows, or make his condition in society uncomfortable, to bring him into contempt or ridicule, is a libel. To call a man a fool is not the subject of an action of slander; yet to publish of a man that he is a fool is libellous. To publish of a man that he is a villain is libellous; yet there is no word of a more uncertain meaning than this. One man regards another as a villain who does not pay his debts; another will denounce seduction as villainous; another, with more legal accuracy, would call a man a villain who was dependent on another; and this is no moral offence, though degrading: so of the word rascal, which does not imply any particular charge. It does not need the imputation of a moral offence; but any thing reflecting on a man's character, intellect, person, habits or manners so as to degrade him, to bring him into ridicule or contempt among his fellow men, is a libel. Take the definition in Chitty. "Any thing which tends to degrade, or disgrace, or bring into contempt or ridicule." I do not deny that the publication must impute something which has the effect to degrade or bring a man into ridicule; but the means of ridicule are infinite; it may be by an allegory, a picture, an effigy, an indirect allusion; and a libel may be perpetrated by ridicule which conveys no precise idea of immorality. 2 *Wils.* 186; 5 *East*, 303, 471; 18 *Com. Law Rep.* 139, *Lord Churchill* vs. *Hunt;* 3 *Salkeld*, 226.

The jury have settled the matter of damages, and it is only for the court to say whether in the common acceptation of language, men reading this paper would not take up an unfavorable opinion of Mr. Rice; and whether its tendency and effect were not to degrade him among his fellows and injure his reputation. Legal malice is such as it has been described by the other side; the doing the act without lawful excuse; but *express* malice is a very different matter, and has much to do with this action.

The manifest tendency of this paper is to injure the reputation of

Rice, and such was its object. The best test of it is to put it in the hands of any intelligent man, and ask if the impression conveyed to his mind is not that these papers stolen from Simmons had fallen into Rice's hands, and that he, without knowing whether they were stolen or not (for this is not material, though it might bear that implication to some minds) had attempted to put them in charge against Simmons. This is not only calculated to injure the reputation of Rice, and to degrade him; but it is the charge of a distinct immoral or dishonest act. The charge itself implies that Rice has illegally attempted to enforce the papers. This follows from the fact that they were stolen, and the caution to the public. And I need not be answered that this was a necessary precaution to shield Simmons against loss; though if that were necessary, he went beyond the means necessary for that purpose. But these were not papers passable by delivery or indorsement, and *Biles, on Bills of Exchange,* has no application to them. The papers are incapable of assignment by delivery; and the charge that a man has attempted to put them in claim, implies that Rice knew he had no title to them. He could not sue on them without using the name of the assignor; and, if they had been stolen, Rice must have known of the defect in his own title. The charge of dishonesty is fairly inferrible from the paper; and this inference would be made by almost every man who should read it. It at all events contains an imputation tending to degrade Rice; and as specific as the charge of being "a villain," "a rascal," "a fool," "of having rode skymington," &c.

*By the Court:*

Harrington, *Judge.*—The question reserved in this case presents some interesting points of consideration in the law of libel, the more interesting because of the novelty of this action in our courts. Actions on the case for *verbal* slander have been of more frequent occurrence; in the trial of which, the principles relating to that form of slander have been investigated, and to some extent settled. But the law governing civil actions for *written* slander has few precedents in the judgments of our courts; and on many points, the principles which are to govern our decisions, do not rest upon any authoritative adjudication in this country.

Going back, then, to the common law fountain, if we are to yield to the weight of learned opinions, or recognize the force of adjudged cases, we must assent to the distinction, (regretted though it has been by high authority, and argued against, as having no foundation in reason or expediency,) between *spoken* and *written* slander. The same words which may be spoken with impunity, without subjecting to legal responsibility, may be actionable if written and published.

So frequent and uniform have been the decisions founded on this distinction, that Sir James Mansfield yields to it, though reluctantly, in *Thorley* vs. *Lord Kerry*, (4 *Taunt.* 365,) as established by some of the greatest names known to the law, including *Lord Hardwicke, Hale,* chief justice, *Holt,* and others. The reasons by which this distinction has been vindicated are, that written slander is much more extensively and permanently injurious to character than verbal, being more widely circulated ; that it is, therefore, more aggravated and dangerous, as tending to breaches of the peace ; and that the deliberation necessary to prepare and circulate a written slander evinces greater malice in the slanderer, and is worthy of stricter punishment. But to these reasons it has been answered, that the first may or may not be true, according as the slander may have been spoken or the libel published, as the former might, under circumstances, be circulated more extensively than the latter ; and that the two last reasons have no application to the question, as neither the tendency to a violation of the peace, nor malice, is the foundation of a civil action, which is merely for damages for the wrong done to reputation by the slander.

Assuming the distinction, however, to exist ; the question is, to what extent does it go. It was conceded in the argument, that actionable words must be such as to impute a punishable crime, or infectious disorder ; such as tend to injure a person in his office, trade or business ; or such as produce special damage. Words of general abuse, however opprobrious, and however vexatious, do not form the subject of an action of slander, unless they may bring the party charged in danger of criminal punishment, exclude him from society, deprive him of his office, or of the profits of his trade or occupation, or actually do him other special damage. Thus to call a man " foresworn ;" or a "scoundrel ;" or a " cheat ;" or a " rogue ;" or a " rascal ;" or a " swindler," have been considered not actionable, because the words do not *necessarily* import *punishable* crimes. 3 *Wils.* 177 ; 6 *T. Rep.* 691 ; 2 *H. Blac.* 531 ; 4 *Co.* 16, *b.* ; 2 *Ch. Rep.* 657. But in written slander, it is different ; and it was conceded on the part of the defendant in the argument of this case, that a publication affecting character may be libellous, though it do not impute a punishable crime. Yet it was insisted that it must impute a specific offence, or other moral delinquency ; that mere scurrility or general abuse is no more actionable when written than if spoken ; and even granting that it has a greater tendency to provoke a breach of the peace, this does not make it any more the subject of a civil action, though it may merit consideration on an indictment for the public offence. On the other side it has been contended, that whatever is a libel for the purpose of criminal prosecution is so for the purpose of a civil action,

and that any publication which tends to degrade or disgrace a man, to lower him in the estimation of his fellows, or make his condition in society uncomfortable, to bring him into contempt or ridicule, is a libel.

I do not see much difference between these positions. Any written slander upon a man's reputation which tends to disgrace or degrade him among his fellow men, or even to induce an ill opinion of him, is a libel; but how can any thing be supposed legally to have that tendency, unless it impute some offence or moral delinquency? I throw out of view now, cases of libelling by signs or pictures, cases of mere ridicule, (though it would be difficult to suppose a libel of this kind which did not convey some specific imputation,) and confine myself to the case of a slander on character or reputation effected by a written publication; and to the question whether mere general abuse or scurrility, not imputing any specific offence or delinquency, legal or moral, can amount to a libel.

Mr. Starkie's general definition of slander is " any false, malicious and personal *imputation* effected by writings, pictures or signs, and tending to alter the party's situation in society for the worse." (*Star. on Slander*, 140, *ch.* 5.) According to Mr. Chitty, " a libel signifies any malicious defamation, expressed either in printing, writing, pictures or effigies. Every written calumny is actionable and punishable, although it do not *impute* any *indictable* offence, but merely tend to disgrace or ridicule or bring into contempt the party calumniated, even by *imputing* hypocrisy or want of proper feeling, and still more if it *impute* fornication, swindling, or any other deviation from moral rectitude or principle. (1 *Chitty Gen. Prac.* 43.) From which it is to be collected as the understanding of these respectable authors, that a direct imputation or charge of a punishable crime was necessary to sustain an action for verbal slander, and that an imputation of some offence, or at least of something that would degrade or lower a man in public estimation, was equally necessary to sustain an action for written slander.

The case of *Robinson vs. Germyn, et al.* (1 *Price Exc. Rep.* 11,) turned expressly upon this point, and was decided on the ground that there was no express imputation of moral delinquency, though it must be admitted that the publication was insulting and vexatious. The plaintiff was a clergyman, officiating as such at the place of publication, and the defendants posted this notice in the room of a certain public society. " The Rev. John Robinson and Mr. James Robinson, inhabitants of this town, not being persons that the proprietors and annual subscribers think it proper to associate with, are excluded this room." It was averred to have been done maliciously, to insult and

degrade the plaintiff, so being such minister, and to cause it to be suspected and believed that he was a person unfit to be associated with ; but the court held it no libel. *Graham*, baron, said " he could not agree to extend the doctrine of words being libellous in writing which are not so in speech. It should in all cases be clearly shown that the words contain a libel. Though words conveying dark insinuations should not be suffered to escape, they must in all cases admit of a clear and obvious sense, and the declaration should point their meaning by innuendo. It is not enough that the consequences of words uttered be probably injurious to character, if the terms do not show such probability to the court." *Wood*, baron, said " the paper is no libel unless some imputation appear. If an imputation be expressly charged by words, it would be sufficient to state the words. If they are ambiguous, an innuendo is necessary, or a special averment." The other judges concurred.

It is true that some of the definitions of slander by writers of authority, and many of the adjudged cases, do not lay particular stress on the necessity of such express imputation; but it will be found on examining the authorities, that the cases in fact contain such imputation, from which I conclude that it is fairly embraced within the meaning of these definitions.

Thus Selwyn defines a libel to be " a malicious defamation, expressed in printing or writing, or by signs, pictures, &c., tending to injure the reputation of another, and thereby exposing such person to public hatred, contempt or ridicule." (2 *Wh. Selw.* 795.) And he cites the case of *Villers* vs. *Mousley*, (2 *Wils.* 403,) and the definition of chief justice *Wilmot*—" If any man deliberately or maliciously publishes any thing in writing concerning another, which renders him ridiculous or tends to hinder mankind from associating or having intercourse with him, an action lies against such publisher." But upon examining the case out of which this last definition in fact grew, and which is cited as the authority for Selwyn, it will be found to have contained a direct imputation of a contagious disorder. And it is to be remarked, that this libel, which was a scurrilous publication in doggerel poetry, contained much general abuse that was not noticed either in the argument or in the judgment of the court, which was made to rest on the direct imputation that the plaintiff had the *itch ;* as to which the chief justice said he could see no difference between this and cases of *leprosy* and the *plague*, because either of them tended to exclude a man from society.

Chief Justice Parsons, in *The Com.* vs. *Clap*, (4 *Mass. Rep.* 163,) defines a libel to be " a malicious publication, expressed either in printing, writing, or by signs and pictures, tending either to blacken the memo-

ry of one dead, or the reputation of one who is alive, and expose him to public hatred, contempt or ridicule." The case in which this definition was given, was an indictment for the following publication—"Caleb Hayward is a liar, a scoundrel, a cheat and a swindler;" upon which no question could have arisen on the point now under consideration, as the libel charged not merely moral obliquity, but legal offences.

Chancellor Kent, (2 *Kent's Com.* 17,) adopts this definition of chief justice Parsons, and adds that " expressions which tend to render a man ridiculous or lower him in the esteem and opinion of the world, would be libellous if printed, though they would not be actionable if spoken." And he cites *Villers* vs. *Mousley,* before referred to ; and *Woodward* vs. *Dowsing,* 2 *Mann. & Ryl.* 74, (17 *Com. Law* 292.) That was an action for a libel on the plaintiff, as overseer of the poor. It was moved in arrest of judgment, that the paper did not convey any *imputation* which could make it the subject of the action. Lord Tenterden, chief justice said, that being a case of written slander, whatever tends to bring a party into public hatred and disgrace is actionable. And he asks " can any man read this libel without saying it charges the plaintiff with oppressive conduct? *Bailey,* justice : " the libel charges a breach of duty and oppression." The other judges concurred. This, therefore, was clearly a case directly *imputing* to the plaintiff oppression of the poor and violation of official duty, on either of which grounds it was actionable.

No inference against the position taken can, therefore, be made from the fact that definitions of high authority do not in terms require the imputation of a specific offence, since they do not exclude the necessity of such imputation ; and the cases in which they arise, or upon which they are founded, are all cases where such a charge or imputation manifestly appears. It remains for me to inquire whether any case has been cited, or can be found, of a different character.

In *Bell* vs. *Stone,* (1 *Bos. & Pull.* 330,) a letter written to a third person calling plaintiff a *villain,* was held actionable. It was remarked in the argument in reference to this case, that villain was a word of very uncertain signification, and did not with all men, necessarily imply any offence : that one man regarded another as a villain, who did not pay his debts ; and another, referring to the original meaning of the word, one who was in subjection, or owed service to another. But I apprehend that there is no popular or common signification attached to that word, reconcileable with honorable and fair standing, and that the imputation of villainy is necessarily a charge of dishonesty or other gross moral turpitude. It cannot be true, that in the opinion

of any man he who does not pay his debts, if from misfortune or other innocent cause he is unable to pay them, is a villain; while he who will not pay his debts though able, cannot be regarded as an honest man; and the written charge of such *villainy* would in my opinion, amount to a libel; because the inevitable effect would be to degrade him in society.

*Brown* vs. *Croome*, 3 *Com. Law* 353, (2 *Stark.* 297,) was cited for the plaintiff. That was the case of an advertisement charging a bankrupt with *fraudulent* preference of certain creditors, and calling a meeting of his creditors generally. There was no question but that the imputation was libellous, the only question being whether the advertisement was not authorized by the occasion and object, and *Delany* vs. *Jones*, (4 *Esp. Rep.* 191,) was referred to on this point, but Lord Ellenborough, interrupting the counsel, distinguished that case from this, by saying " in that case the publication did not *assert any thing of bigamy*;" that is, it contained no direct libellous imputation.

The case referred to is very strong on the point under consideration. The declaration stated that the defendant, intending to charge the plaintiff with the crime of bigamy, made this publication. " Ten guineas reward. Whereas, by a letter lately received from the *West Indies*, an event is stated to be announced by a newspaper that can only be investigated by these means:—this is to request, that if any printer or other person can ascertain that *James Delany, Esq.*, some years since residing at *Cork*, late lieutenant in the north Lincoln militia, was married previous to nine o'clock in the morning of the 10th of *August*, 1799, they will give notice to —— Jones, No 14, *Duke street, St. James'*, and they shall receive the reward." And there was an innuendo that the defendant meant thereby to insinuate and be understood, that the plaintiff was a married man at the time he married his present wife. The defence was—1st, that the publication was justifiable; and 2d, that by its terms *no direct slander was conveyed*, without which there could be no libel. Lord Ellenborough charged the jury, that they must be of opinion that the paper carried an *imputation* that the plaintiff was *guilty of bigamy*, as that meaning was necessary to make the paper a libel at all. The defendant had a verdict.

The case cited of *M'Corkle* vs. *Binns* (5 *Binn. Rep.* 340,) was adjudged to be a libel because it charged the plaintiff with *infamous falsehoods*, for which he had been deprived of a participation in the chief ordinance of the church to which he belonged; and in the case mentioned, but not read, of *Lord Churchill* vs. *Hunt*, (18 *Com. Law Rep.* 139,) the libel charged the plaintiff with attending a public ball on the very evening of the day on which by his furious and careless

driving he had caused the death of a young lady. There was other libellous matter in the narr., and the case went off on a question of pleading. The syllabus assumes that " written slander is in general actionable when it imputes defects in *moral virtue*," a position that requires other support than the authority referred to, of *Thorley* vs. *Lord Kerry*, (4 *Taunt.* 355,) where the charge was, that the plaintiff " under the cloak of religious and spiritual reform, hypocritically and with the grossest impurity, deals out his malice, uncharitableness and falsehoods." Sir James Mansfield, in delivering the opinion of the court said " there is no doubt that this was a libel for which the plaintiff in error might have been indicted and punished ; because, though the words impute no punishable crimes, they contain that sort of *imputation* which is calculated to vilify a man, and bring him, as the books say, into hatred, contempt and ridicule.

A great number of cases might be cited to the same effect, and I have not been able, in the course of my examination, to find any that seems to conflict with the principle assumed, unless it be the case in 3 *Salkeld*, 226, and the one therein cited. The point of this latter case cannot be understood from the reference, nor can I find any report of it. What " riding skymington" was is not known at this day ; it seems to have been a charge against a husband, probably a violation of some of the marital duties ; at all events a grievous charge, for which the husband had an action. As to the case in Salkeld, the language of the court obviously goes further than the case itself; for though chief justice Holt said that scandalous matter was not necessary to make a libel, but it was enough if the defendant induced an ill opinion to be had of the plaintiff, or made him contemptible and ridiculous, the libel he had under consideration charged the plaintiff with a want of loyalty and patriotism, if not with treason ; and it was laid as matter of special damage that he lost his election to parliament on account of it. He was charged with having declared that " he could see no end to the war with France, unless the young gentleman on the other side of the water, (innuendo the prince of Wales,) be restored," and the court said " every man understands what is meant by the young gentleman on the other side of the water."

I am not sure that this case is reconcileable with the principle which I have supposed to govern all the cases ; but no one can investigate the law of libel without feeling an invincible repugnance to admit in their full extent some of the old cases. Indeed, Mr. Justice Lawrence, in *Woolworth* vs. *Meadows*, (5 *East*, 468,) says, that " many of the old cases on slander went to a very absurd length." It cannot be that we are bound to run into the same absurdities; that, at this day, and in this country, the opinions of black letter judges, however

learned; the judgments of star chamber courts, so often subservient to state purposes; and the whole law of slander, *scandalum magnatum* and all, must, in the absence of legal enactments, be regarded by our courts as the law of this state; without considering the great advances that civil liberty has made throughout the world, and that the liberty of speech and of the press is now a very different thing from what it was in the ages from which these precedents are drawn.

On the whole, I regard it as a principle of the common law, to be collected if not from all the cases, at least from all that at this day and in this country, can be recognized as authority; that written slander to be actionable, must impute something which tends to disgrace a man, lower him in, or exclude him from society, or bring him into contempt or ridicule; and that the court must be able to say from the publication itself, or such explanations as it may admit of, that it does contain such an imputation, and has legally such a tendency. That mere general abuse and scurrility, however ill-natured and vexatious, is no more actionable when written than spoken, if it do not convey a degrading charge or imputation. Against all such attacks, a man needs no other protection than a good character; and the law will not suppose that damage can happen to such a character from the pointless arrows of mere vulgarity.

It is not intended by this, that to make a publication libellous it must contain a direct and open charge; nor can this principle be used as a protection to covert and insidious slander. The publication must be judged of by its general tenor; and if, taking the terms in their ordinary acceptation, it conveys a degrading imputation, however indirectly, it is a libel. As was said in *Peake vs. Oldham*, (*Cowp.* 275,) " where words from their general import, appear to have been spoken with a view to defame a party, the court ought not to be industrious in putting a construction upon them different from what they bear in the common acceptation and meaning of them." Thus in the manuscript case of *Ward* vs. *Reynolds*, cited by Lord Mansfield, the defendant said to the plaintiff " I know you very well; how did your husband die?" The plaintiff answered " as you may, if it please God." The defendant replied " no; he died of a wound you gave him." On not guilty pleaded, there was a verdict for the plaintiff; and on motion in arrest of judgment, the court held the words actionable, because *from the whole frame of them, they were spoken by way of imputation.*

A stronger illustration is furnished by the case of *Woolworth* vs. *Meadows*, (5 *East*, 463,) which was an action of slander, and the question was, whether a *crime* was *imputed* by these words :—" His character is infamous. He would be disgraceful to any society. Who-

ever proposed him must have intended it as an insult.  I will pursue him and hunt him from all society.  If his name is enrolled in the Royal Academy, I will cause it to be erased and will not leave a stone unturned to publish his shame and infamy ; delicacy forbids me ,from bringing a direct charge, but it was a male child of nine years old who complained to me."  It was strenuously urged that here was no specific imputation of a crime, but the court held otherwise, say- ing that they must understand them as all mankind understood them, and it would be impossible for a number of persons, indifferently as- sembled, not to agree that these words *imputed an unnatural crime.*

With this qualification, and so understood, the principle which limits actions for libel to such publications as impute some moral offence, or other degrading charge, is not liable to be abused for the protec- tion of the slanderer, while at the same time it confines the action within reasonable limits.  Without it we are afloat : every thing is a libel that offends a man's pride or wounds his feelings.  Without it the action is not confined to slanders which may produce injury to character or personal standing, but embraces every thing that is scur- rilous or abusive.

By this principle I proceed to examine the publication for which the present action is brought ; inquiring, not whether it was an unkind and unneighborly act on the part of Simmons ; calculated, perhaps de- signed, to wound the feelings of Rice, and excite his anger ; but whe- ther it charges him with any thing which this court can say tends to degrade him as a man or as a merchant, or to injure his reputation or character.

I remark, in the first place, that if the alledged libel contains any thing that is obscure or needs explanation to give it the force of slan- der, the pleader should point it by innuendo or prefatory averment. If the words used do not of themselves, or by the connection in which they are used, convey an evil import, they should be connected by averments with such a state of facts as would show that they con- tain a slanderous imputation.  If this be not done, the inference will be that it could not be done consistently with the truth ; and if the words be innocent in themselves, they must be taken to be innocent in their bearings.  I am not to be understood as expressing the ex- ploded doctrine of taking words *in mitiori sensu,* nor as supposing that an innuendo can enlarge the meaning of words ; the language used must be construed in its ordinary sense ; but it may have a con- nection with facts which would give it a very different coloring, and by proper averments *capable of proof,* its connection with such facts may be shown and its true meaning presented.  Thus one of the charges in this case is, that Rice had endeavored to put in claim

against Simmons, certain grain receipts which Simmons had once paid and taken up. This may or may not have been dishonest in Rice. Put in claim; how? Grain receipts; to whom payable? If originally due to Rice himself, and he brought suit on them after they were paid, it would be a charge of dishonesty; and even if he had sued upon them, knowing that they had been paid, it might be considered as dishonorable; but suppose they were payable to another, and had come to Rice's possession bona fide and for a valuable consideration, without any knowledge or even suspicion that they had been paid, it would be no imputation on Mr. Rice's honesty or honor, to say that he had put them in suit. It was for the plaintiff to explain by his averments, in what way the putting such papers in suit or claim was dishonest or dishonorable. But when we know as we do, from the trial of the cause, that no other averment could have been made consistently with the truth, than that these were grain receipts, appearing on their face to be due to a Mrs. Cleland, and that the only act of putting them in claim by Rice, was the sending them as lost papers to the person who appeared to be the lawful owner, we are not surprised that there is no averment giving this charge a darker coloring than its terms import. I recur, therefore, to the terms of the publication; and to the inquiry whether it presents on its face any degrading imputation, and what that imputation is.

The whole publication is as follows:—

" The public are hereby cautioned against receiving from Washington Rice or John Agness, a black man, any papers relative to my business, as sundry papers hath been purloined from my store and fell into the hands of said W. Rice, who hath endeavored to put some of them in claim against me; viz: bills and receipts for grain I had bought and paid for, which was returned to me by the holders when their crop was delivered and I paid for it."

There is an innuendo in the declaration that the defendant intended to charge Rice with having endeavored to use these papers, *knowing them to have been stolen;* undoubtedly if this be so, it is a libel; but I think the paper will not bear this construction, as the receipts are stated to have *fallen into* Rice's hands after they were purloined, and there is nothing which charges him with a knowledge of their having been stolen, when he attempted to collect them. Having fallen into his hands without such knowledge, I do not think there is necessarily an imputation against character in the charge that he had endeavored to put them in claim. The meaning is not clear; but take it to be that he had brought suit upon them, it is still capable of a good or a bad signification; it might be dishonest or it might be lawful and right. There is no rule of construction that authorizes

us to give the preference to either sense; but, as the plaintiff is bound to make out his case, if the words do not on their face convey a libellous imputation, and he does not show by his averments that they have that meaning, he must fail. Upon this charge, therefore, if it stood alone, I should not feel justified by the principles that govern the action, to pronounce this a libel; but there is other matter in this publication which conveys to my mind more clearly a degrading imputation, and such as was calculated to injure the plaintiff's character.

The publication asserts that these grain receipts, or due bills, had been taken up and paid by Simmons; that they had been purloined from his store and " fell into" the hands of Washington Rice, who had endeavored to put some of them in claim against him : all this I have supposed was not libellous, because as it does not assert the knowledge on the part of Rice, either that the bills had been paid or stolen, it does not necessarily charge him with any thing wrong, in attempting to put them in suit; but the paper proceeds to hold Mr. Rice up before the public and to caution them against him as a man, who after having endeavored to collect some of these due bills out of the debtor himself, would be guilty of passing them off on the public, and of using such an agent as John Agness, the black man, for this purpose. If this imputation be cast by the publication, it seems to me there cannot be any doubt that it is a libel according to settled principles; and it is clear to my mind that such is the fair meaning of the words used. Indeed, the only hesitation I have had in placing my judgment on this ground, is the fact, that it did not, on the argument, seem to strike others with the same force.

Does the paper authorize this reading? and if so, does it not convey a libellous imputation, by holding Mr. Rice up as a man who would be guilty of dishonest conduct, and by placing him in a degrading connection and association? It is true, that we have nothing to do with the character of John Agness, though that would have been material had it been averred in the declaration to be as degraded as it was stated to be in the argument; but the publication calls him a black man, and as such we are bound to notice him as the associate or *agent* of Mr. Rice, in the act against which it was thought necessary to caution the public. Am I right in saying the paper presents Agness as the associate or agent of Rice, in passing off these bills? I think it does make him the agent. It does not state that any of the purloined papers fell into Agness' hands, but cautions the public " against receiving from Washington Rice, or John Agness, a black man, any papers relative to my business, as sundry papers hath been purloined from my store and *fell into the hands of said W. Rice.*"

Whatever papers were purloined are stated to have fallen into Rice's hands, and the caution against receiving these papers either from Rice or Agness I think, without any strained construction, presents the latter as the agent or instrument of the former, in putting off these bills. Then what is the charge implied in the caution as to Rice but that, after endeavoring to enforce these evidences of debt against Simmons, he would attempt to put them off on the public, either personally or by the agency of another? I consider this as representing Mr. Rice to be a dishonorable, if not a dishonest man. The gist of the imputation is, that Rice, after endeavoring to enforce these claims, would be guilty of putting them off on the public ; the suit against Simmons necessarily *disclosed* that these bills had all been *paid off and afterwards stolen;* and, even if they came lawfully to Rice's hands, he could not as an honest man, *afterwards* attempt to pass them on the public as obligatory and valid evidences of debt. Yet the publication *holds him up* as a man *capable of attempting this,* and thus denounces him as a *dishonest man.*

I do not examine whether such a caution to the public might have been justified as a protection to Simmons against subsequent holders of these due bills ; that question has been tried by the jury, and they have found that there was no necessity arising out of any supposed liability to pay these bills again, for him thus to go out of his way to slander the plaintiff.

I am aware also, that it may be said that this is making out a libel by argument or inference ; but it must be remembered, that though the law requires the imputation of something that will dishonor or degrade a man, or lessen his standing in society, it does not require that such imputation should be in express terms, nor does it afford any countenance or refuge for covert and insidious slander. If it did so, it would extend but little protection to reputation. The character of a libel is to be judged of by the effect it produces on the mind ; it does not always happen ; and, when the slanderer writes in the fear of the law, it will not often happen ; that you can at once put your finger on the libellous matter, and the attempt to show in what it consists may depend much on inferential reasoning ; while yet the impression may be distinct on the mind of every reader, and all the damage result to character that would arise from a plain and direct charge.

On the whole, I am satisfied that this publication does contain a a libellous imputation on Mr. Rice's reputation and standing, and my opinion is, that judgment should be entered for the plaintiff.

LAYTON, *Judge :*—I concur in the general views of Judge Har-

rington, as to what constitutes a libel; and that an imputation of some offence, or a charge of the want of some moral principle, which tends to degrade the individual, must be fairly deducible from the publication. The application of his reasoning to the writing under consideration is, I think, rather too confined. I consider this publication libellous in other respects than that particularly pointed out.

The language used is to be taken in its ordinary sense.

*Judge* BLACK, concurred. He had drawn up an opinion at length, but declined delivering it, as he came to the same result with Judge Harrington. He was not disposed to confine so strictly to the necessity of a *special imputation.*

*Chief Justice,* J. M. CLAYTON :—At the trial, the inclination of my opinion was, that the publication did not contain a libel; and I think now it is only libellous on the *single point,* and for the reasons presented by Judge Harrington. I concur, therefore, in the *result* of that opinion, and in its *reasoning generally.*

*The Chancellor* concurred generally.

Judgment for plaintiff.

*Wales* and *J. A. Bayard,* for plaintiff.
*R. H. Bayard,* for defendant.

—◆»)●●�too◄«◄—