GEOFFREY D. CANT AND F. CARVEL PAYNE v.
EVELYN M. BARTLETT, PERS. REP. OF
THE ESTATE OF J. KEMP BARTLETT

[No. 50, September Term, 1981.]

*Decided February 9, 1982.*

612

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Robert A. Zarnoch* and *Linda H. Lamone, Assistant Attorneys General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellants.

*W. Porter Ellington,* with whom was *Alan V. Cecil* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall hold in this case that the order of a trial judge permitting substitution of the personal representative of a deceased litigant as plaintiff in an action for libel was not an appealable final order. Hence, we shall affirm the order of the Court of Special Appeals dismissing the appeal from the trial judge's action. Because, however, it would be a waste of time for these parties to go back, try the case, and then learn on appeal that the action abated by the death of the plaintiff, we shall set forth the basis of our view that the trial judge erred when he permitted substitution of the personal representative of the deceased.

J. Kemp Bartlett sued Geoffrey D. Cant and F. Carvel Payne in the Circuit Court for Anne Arundel County. Only an action for libel remained in the suit after demurrers to certain counts were sustained. Bartlett died. Thereafter, a motion was made to substitute his personal representative as the party plaintiff. Cant and Payne opposed the motion,

contending that the defamation action had abated by the death of Bartlett. They appealed to the Court of Special Appeals. Upon motion of Mrs. Bartlett, who is the personal representative, the intermediate appellate court dismissed the appeal on the ground that it was not an appeal from a final order. We then granted the writ of certiorari in order that we might address the issue.

## I Appealability

At issue here is whether the circuit court's order of substitution and revival is a final judgment for the purposes of appeal within the meaning of Maryland Code (1974) § 12-301, Courts and Judicial Proceedings Article. That section provides in pertinent part:

> "Except as provided in § 12-302, a party may appeal from a final judgment entered in a civil . . . case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. . . ."

There is no contention here that the appeal comes within one of the exceptions set forth in § 12-302. Likewise, there is no claim that the order here is from one of the interlocutory orders listed in § 12-303 from which an appeal is permitted.

The leading case of *Peat & Co. v. Los Angeles Rams,* 284 Md. 86, 394 A. 2d 801 (1978), sheds considerable light on what constitutes an appealable final judgment. That case involved an accounting firm's motion to require the withdrawal of a Baltimore City law firm from further representation of the Rams. The circuit court denied the motion. An appeal then was taken to the Court of Special Appeals, which dismissed the appeal as not permitted by law.

When the case reached us, we dealt with the issue of whether the order refusing to disqualify the law firm from further participation in the proceedings was a "final judg-

ment" within the contemplation of § 12-301. We noted in that case that the General Assembly in § 12-101 (f) of the Courts and Judicial Proceedings Article had defined "final judgment" as "a judgment, decree, sentence, order, determination, decision, or other action by a court . . . from which an appeal, application for leave to appeal, or petition for certiorari may be taken." Judge Digges pointed out for the Court, however, that, "as this definition implies, it is ultimately for this Court to decide which judgments or orders are final and therefore appealable under section 12-301. *Warren v. State,* 281 Md. [179], 183, 377 A. 2d [1169], 1171 [(1977)]." 284 Md. at 91. Quoting *United States Fire Ins. v. Schwartz,* 280 Md. 518, 521, 374 A.2d 896 (1977), *overruled, Department of Public Safety v. LeVan,* 288 Md. 533, 419 A.2d 1052 (1980), we said that the prior attempts of this Court to determine if a particular trial court action is appealable do not always involve questions readily capable of delineation. The underlying policy of the final judgment rule is that piecemeal appeals are disfavored. Accordingly, we have stated that as a general rule an appealable judgment is one that "must be so final as to determine and conclude rights involved, or deny the appellant means of further prosecuting or defending his rights and interests in the subject matter of the proceeding." 280 Md. at 521.

In the course of the discussion in *Peat & Co.* we said that the trial court's refusal to disqualify the attorneys in question had in no way precluded Peat & Co. from fully defending its interest in the pending law suit, or concluded the question of its liability. We held that in that context the order was not a final judgment. 284 Md. at 91.

The Court addressed the argument that the circuit court's order was appealable as a "collateral order," which is an exception to the final order requirement. Citing the Court's application of the collateral order exception in *Stewart v. State,* 282 Md. 557, 571, 386 A.2d 1206 (1978), and *Jolley v. State,* 282 Md. 353, 357, 384 A.2d 91 (1978), Judge Digges reiterated for the Court in *Peat & Co.* the ambit of the exception:

"The concept is narrow in scope, however, for, as the Supreme Court has articulated, if the order is to come within the 'small class' of cases included in the final judgment rule under *Cohen* it must meet four requirements: '[T]he order must [(1)] conclusively determine the disputed question, [(2)] resolve an important issue [,(3) be] completely separate from the merits of the action, and [(4)] be effectively unreviewable on appeal from a final judgment.' *Coopers & Lybrand v. Livesay,* 437 U. S. 463, 468, 98 S. Ct. 2454, 57 L.Ed.2d 351 (1978) (footnote omitted); *see Cohen v. Beneficial Industrial Loan Corp.,* 337 U. S. [541,] 546 [, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949)]." 284 Md. at 92.

As indicated, we deemed the circuit court's order refusing disqualification as not immediately appealable. In support of this conclusion, Judge Digges noted for the Court: (1) the potential floodgate effect incident to appeals concerning the propriety of a trial court's ruling on particular facts; (2) that the question of whether to disqualify counsel was one addressed to the discretion of the trial court; and (3) the absence of sufficient import to warrant immediate appellate review because serious and unsettled questions were not presented. *Id.* at 96-97. We also declined application of the interlocutory appeal statute. *Id.* at 98.

As recently pointed out in *Lewis v. Lewis,* 290 Md. 175, 182, 428 A.2d 454 (1981), and *Pappas v. Pappas,* 287 Md. 455, 460, 413 A.2d 549 (1980), generally it is only those interlocutory orders specified in § 12-303, Courts and Judicial Proceedings Article, which are immediately appealable.

Thus, as was stated in *In re Buckler Trusts,* 144 Md. 424, 125 A. 177 (1924), a decree or an order, to be appealable, "must be so far final as to *determine* and *conclude* the rights involved in the action. . . ." 144 Md. at 427 (emphasis added). At issue in that case was the appealability of a decree appointing substituted trustees pursuant to a deed of trust, and an order striking from the files a document submitted in opposition to that appointment. In dismissing the

appeal, the Court observed that the appellant had no direct interest in the subject matter of the litigation and that the appellant improperly intervened. *Id.* at 427-28. Nothing in the order and decree appealed from precluded a proper proceeding to enforce or to defend the rights and interests at stake. *Id.* at 428; *see Rowe Co. v. Rowe,* 154 Md. 599, 604, 141 A. 334 (1928) (order directing intervention was interlocutory and nonfinal; thus order was not immediately appealable). Finality for the purposes of appeal requires settlement of the rights of the parties. *D. C. Transit Systems v. S.R.C.,* 259 Md. 675, 682, 270 A.2d 793 (1970); *Concannon v. State Roads Comm.,* 230 Md. 118, 125, 186 A.2d 220 (1962); and *Hopkins v. Easton Nat. Bank,* 171 Md. 130, 135, 187 A. 874 (1936).

Examination of the plethora of case law bearing on the question of finality for the purposes of appeal produces the following catalog: *Clark v. Elza,* 286 Md. 208, 211-13, 406 A.2d 922 (1979) (order denying motion to enforce oral settlement of tort action, albeit not final, nonetheless was appealable as within the collateral order exception); *Schlossberg v. Schlossberg,* 275 Md. 600, 606-15, 343 A.2d 234 (1975) (order which did not finally determine proper parties and issues to be tried, or send issues from an orphans' court to a law court for trial was not final and thus not immediately appealable); *Ventresca v. Weaver Brothers,* 266 Md. 398, 402-03, 292 A.2d 656 (1972) (order striking an enrolled judgment divested a substantial right and thus was immediately appealable); *Griffin v. St. Mary's College,* 258 Md. 276, 279, 265 A.2d 757 (1970) (order sustaining demurrer to petition for writ of mandamus with leave to amend was not a final judgment or immediately appealable); *Lawrence v. Dept. of Health,* 247 Md. 367, 371-72, 231 A.2d 46 (1967) (denial of plaintiff's motion for summary judgment was not a final order from which an appeal might be taken); *Commissioner v. Steudl,* 233 Md. 543, 545, 197 A.2d 432 (1964) (order striking declaration but granting leave to amend within a specified period of time did not conclude rights of the parties on the facts of that case or constitute a final judgment); *Concannon,* 230 Md. at 119-25 (order

granting the State Roads Commission leave to amend its petition to condemn and the accompanying plat was an appealable final order because it determined substantial rights of the property owners); *Eisel v. Howell,* 220 Md. 584, 586-90, 155 A.2d 509 (1959) (denial of order denying challenge to jurisdiction and staying proceedings to permit arbitration did not settle or conclude rights of any party and thus was not appealable); and *Bonner v. Celanese Corporation,* 193 Md. 132, 135, 66 A.2d 400 (1949) (trial court's granting or refusing a motion for a new trial was not an appealable final order).

When one turns to cases from foreign jurisdictions, the nonappealability of the revivor order in this case becomes more apparent. In *Mackaye v. Mallory,* 79 F. 1 (2d Cir. 1897), the court addressed the appealability of an order reviving a suit upon the plaintiff's death. It viewed the order as merely a continuation of an original suit, saying:

> "A decision is final, in the sense in which an appeal from it is permitted, when it decides and disposes of the whole merits of the cause as between the parties to the appeal, reserving no further questions or directions for the future judgment of the court; so that to bring the cause again before the court for decision will not be necessary. When a bill of revivor is dismissed, as this would practically determine the original cause by leaving it in a situation in which no further proceedings could be had in it, doubtless an appeal would lie in favor of the party seeking a revival; but, if the revival is allowed, the order or decree allowing it does not finally dispose of the cause, and can be reviewed, if it becomes necessary, by an appeal from the final decree therein." *Id.* at 2 (citing cases).

In dismissing the appeal, the court then concluded:

> "In the present case there was no decree upon the bills of review, and the orders are merely interlocutory orders in the cause, and are strictly analogous to an order in a suit at law entered on a

suggestion upon the record admitting the legal representative of a deceased party to continue the action." *Id.*

The Supreme Court of Alabama was faced with a situation strikingly similar to the circumstances now before us in *Land v. Cooper,* 244 Ala. 141, 12 So. 2d 410 (1943). Although the court determined there was no appealable final order, it decided the ultimate issue, as do we here, finding that the litigation had been abated by the death of the sole complainant and could not be revived. In that case an administrator was substituted as a party plaintiff for the deceased original plaintiff. The court held, "The order of the trial court substituting the appellees as parties complainant in lieu of L. M. Cooper is not such an order or decree as will support an appeal." 244 Ala. at 142. On this subject, see Annot., 167 A.L.R. 261 (1947). There is a distinct split of authority around the country on the issue of an order granting or denying revival.

A revivor order is simply not the kind of order contemplated by this Court as deserving the right to immediate appeal. In addition to the disfavored status of piecemeal litigation and appeals, this Court, as well as courts from other jurisdictions, has repeatedly emphasized that the determination or conclusion of a party's rights is a necessary predicate of appealability. The revivor order here has not finally determined either party's rights, is not within the collateral order exception otherwise permitting immediate appeal, does not affect an absolute constitutional right, does not divest substantial rights of the parties, and is amenable to correction upon appeal after a final judgment has been entered. The trial court's order determined only that Mrs. Bartlett as personal representative may now prosecute her deceased husband's libel action.

We say that the order is amenable to correction upon appeal because Rule 887 provides that on appeal from a final judgment "every interlocutory order which has previously been entered in the action shall be open to review by this Court, unless an appeal has theretofore been taken from

such interlocutory order and been decided on the merits by this Court." Rule 1087 provides for such appeal in similar language relative to the Court of Special Appeals. On the other hand, if a trial judge were to deny a motion to revive an action, that would be an appealable final judgment since, to borrow the language used by Chief Judge Brune for the Court in *Concannon,* 230 Md. at 125, that order would deprive the parties "of the means of proceeding further to enforce the right which they assert . . . ."

Cant and Payne contend there is another reason that this order should be appealable. They say that the order in question was beyond the jurisdiction of the trial court and hence appealable. We do not see it that way. Circuit courts are courts of general trial jurisdiction, described in some of our older cases as the successors to the King's Bench. The fact that in this instance the trial judge erred in his conception of what was authorized does not make the order beyond the jurisdiction of the court. Recently, in *Brown v. Baer,* 291 Md. 377, 435 A.2d 96 (1981), Judge Eldridge said for the Court:

"[W]e have held that merely because a trial court's order violates a statute or a rule does not render the order beyond the court's jurisdiction and a nullity; instead, it is only subject to reversal on a direct appeal." 291 Md. at 387 (citing cases).

Also, *see generally* the discussion in *Stewart v. State,* 287 Md. 524, 526-29, 413 A.2d 1337 (1980).

## II Propriety of the revival

Pursuant to the provisions of Rule 885 and in accordance with the procedure we followed in *Equitable Tr. Co. v. State Comm'n,* 287 Md. 80, 411 A.2d 86 (1980), we shall express our views on this abatement issue for the guidance of trial courts generally and in the interest of judicial economy insofar as this particular case is concerned.

Cant and Payne contend here that Maryland Rule 220 a 4 and Code (1974) § 6-401 (a), Courts and Judicial Pro-

ceedings Article, do not permit revival of this action. Rule 220 a 4 states, "Where a party to an action for slander shall die, the action shall abate as to such party." Section 6-401 (a) says, "A cause of action at law, whether real, personal, or mixed, except slander, survives the death of either party." Cant and Payne suggest:

> "The key issue in this case is not whether libel is historically or conceptually different from slander. Rather, the question is whether, in a century-old jurisdictional statute, use of the term 'slander' was intended generically so as to include written slander as well as oral."

The matter of the survival of actions was explained for the Court at some length by Chief Judge McSherry in *Stewart v. United Elec. L. & P. Co.*, 104 Md. 332, 65 A. 49 (1906). In that instance an administrator brought suit to recover damages for the wrongful death of his decedent.[1] Chief Judge McSherry there said for the Court:

> "At the common law the right of action arising from an alleged wrongful act and negligence of the character charged in the *narr.* before us would have abated upon the death of the person thus injured. It was a principle of the common law, that if an injury were done either to the person or property of another, for which *damages* only could be recovered in satisfaction, the action died with the person *to* whom or *by* whom, the wrong was done. So fixed was this rule that it crystallized into a maxim. It was considerably altered, however, by the *Statute of 4 Edw., 3 C. 7, de bonis asportatis in vita testatoris,* which though in force in Maryland prior to the adoption of the *Act of 1798, ch. 101* (*Kennerly's ex v. Wilson,* 1 Md. 107), has no appli-

---

1. It will be recalled that under Maryland's version of Lord Campbell's Act, currently codified in Code (1974) §§ 3-901 to -904, Courts and Judicial Proceedings Article, wrongful death actions are not brought by the personal representative of the deceased. We thus differ from some jurisdictions.

cation to this case. Where the cause of action was founded on any *malfeasance* or *misfeasance* was a *tort,* or arose *ex delicto* — where the *declaration* imputes a tort done either to the person or property of another, and *the plea* must be not guilty, the rule was *actio personalis moritur cum persona.* Note 1, *Wheatley* v. *Lane,* 1 Wms. Saund. 216. But statutes have been adopted in Maryland as well as in many, if not most, of the States of the Union, and fashioned after similar enactments in England, which have materially changed the common law rule; and the question involved on this record comes down to the inquiry as to whether the legislation of this State has abrogated that rule as it would have applied to this case; since if the rule has not been abrogated or modified it will defeat the pending action. Now, there are two distinct lines of legislation on this subject, both of which are in force though adopted at widely different periods of time. The one, beginning with the *Act of 1785, ch. 80,* has relation to the survival of certain personal actions instituted in the lifetime of the plaintiff but which would have abated at the common law upon his death; the other, the *Act of 1852, ch. 299,* almost a literal transcript of Lord Campbell's Act (*9 and 10 Vic.,* ch. 93), gives a right of action under certain conditions to designated relatives of a deceased person, but not to his personal representatives, when death has been caused by a wrongful act or by negligence." 104 Md. at 333-34 (emphasis in original).

Judge Robinson put it a bit more succinctly in *Ott v. Kaufman,* 68 Md. 56, 11 A. 580 (1887), when he said for the Court:

"At common law personal actions of every kind abated on the death of the sole plaintiff or sole defendant, and if the action was founded on contract a new action would lie against the executor or administrator. But if the action was founded on a

tort, for a wrong committed by the defendant, it did not survive, the maxim being *'actio personalis moritur cum persona.'* *Hambly v. Troth,* Cowp. 374; *Wheatley v. Lane,* 1 Saund. 216*a*; *Wentworth v. Cock,* 2 Per. & Dav. 251.

"In the language of Lord Mansfield the wrong and the wrong doer were buried together." 68 Md. at 57-58.

The reaction of the present generation of attorneys and judges might well be that slander refers to words which are spoken while libel refers to words which are written and, thus, that the contention of Cant and Payne is without merit. However, Cant and Payne claim that slander "was commonly used as a term encompassing all forms of defamation." They point to works such as 36 Corpus Juris *Libel and Slander* [§ 4]2, at 1145 (1924), and 1 J. Poe, *Pleading* § 179 (4th ed. 1906), as using "slander" to refer to both oral and written defamation. As a matter of fact, they could very well have referred to C.J.S. and to a later edition of Poe. For instance, it is said in 53 C.J.S. *Libel and Slander* § 1 (b) (1948):

"The word 'slander' is the general and original word for all kinds of defamation; and at an early day in the history of the common law the term applied both to oral and written defamations of character. In this sense it has been defined to be the defaming of a man in his reputation by speaking or writing words from whence any injury in character or property arises, or may arise to him of whom the words are used. However, in modern usage it has been limited to defamation by words spoken, and in this sense may be defined as the speaking of base and defamatory words which tend to the prejudice of the reputation, office, trade, business, or means of getting a living of another." *Id.* at 33.

1 J. Poe, *Pleading and Practice* § 179 (5th ed. H. Tiffany 1925), states:

> "The gravamen of both oral and written slander is the *malicious* design to defame and injure by the *false* charge; and hence, in all actions for redress of either of these wrongs, the effort of the plaintiff in the first instance is to show the existence of this design on the part of the defendant." *Id.* at 136 (emphasis in original).

In § 178 Poe refers to "reasons for considering slander in writing or in print a graver and more serious wrong and injury than slander by word of mouth . . . ."

Cant and Payne point out that in *Miles v. McGrath,* 4 F. Supp. 603, 603 (D. Md. 1933), Judge Coleman said:

> "The second ground alleged in the demurrer is that the suit is barred by the one-year limitation statute of Maryland expressly applicable to actions 'for words' (Maryland Code, article 57, § 1), which, in the absence of a decision of the Court of Appeals of Maryland to the contrary, we must assume is applicable alike to slanderous statements, whether oral or written."

Code (1924) Art. 57, § 1, to which Judge Coleman referred, said that "all actions on the case for words" should be brought "within one year from the time the cause of action accrued . . . ." It might well be that the decision in *Miles* was responsible for the enactment of Ch. 54 of the Acts of 1933 a short time later so that the reference in the statute became to "all actions on the case for libel and slander . . . ." The language of the 1933 enactment is found today in Code (1974) § 5-105, Courts and Judicial Proceedings Article. The statement relative to an action on the case for words is the same as that appearing in the original Maryland statute of limitations on the subject, Ch. 23, § 2 of the Acts of 1715.

Historically, reference to slander in situations similar to that before the Court has been made in two contexts, the question of abatement and the right of a personal representative to bring litigation. The present Rule 220 a 4 has as its source Code (1951) Art. 75, § 29. That section, after

referring to certain actions which were not to abate by death, stated, "This not to apply to actions for slander." Rule 220 was adopted as a result of the Twelfth Report of our Standing Committee on Rules. That report indicated:

"While the codification is intended primarily to codify the existing procedural law of the State, some modifications and additions seemed necessary or desirable. In the June edition these changes were italicized. A comparison of the draft herewith submitted with the June edition will acquaint the Court with the changes thus noted."

When one examines that "June edition," one notes that there was no italicization appearing relative to Rule 220 a 4. Hence, it apparently was the intent of the Rules Committee, and thus of the Court, merely to incorporate the substance of the preceding statute.

Code (1974) § 7-401 (x) (1), Estates and Trusts Article, states, "A personal representative may not institute an action against a defendant for slander against the decedent during the lifetime of the decedent." The Revisor's Note to that section states, "The subsections are rearranged for order and consistency. The only other changes are in language, style, and consistency." Code (1957, 1969 Repl. Vol.) Art. 93, § 7-401 (n), was enacted in the words of the Second Report of the Governor's Commission to Review and Revise the Testamentary Law of Maryland (1968). Section 7-401 (n) provided, "[N]o personal representative may institute an action for slander against the decedent . . . ." The comment of the Commission was, "Subparagraph (n) is intended to cover the substantive provisions now contained in § 270 . . . ." The Commission stated, "The limitations on slander suits . . . contained in subsection (n) are derived from [Code (1957) Art. 93,] § 112 . . . ." That section provided that executors and administrators should "have full power to commence and prosecute any personal action whatever, at law or in equity, which the testator or intestate might have commenced and prosecuted, except actions of slander . . . ." It further provided that they should "be liable to be sued in any

court of law or equity, in any action (except slander) which might have been maintained against the deceased . . . ." The origin of the section was Ch. 101 of the Acts of 1798. This chapter provided that an executor or administrator might commence or prosecute any personal action "which the testator or intestate might have commenced and prosecuted, except actions of slander, and for injuries or torts done to the person . . . ."

The Maryland statute relative to actions not abating, which is found in Code (1951) Art. 75, § 29, and is the basis for our present Rule 220, had its origin with Ch. 80 of the Acts of 1785. We have been unable to find any mention of slander, or libel for that matter, in the abatement statute until the enactment of Code (1860) Art. 2, § 1, which is very similar in its terms to that which became Code (1951) Art. 75, § 29, and which was repealed upon the adoption of Rule 220.[2] The last clause of Art. 2, § 1 states, "this not to apply to actions for slander or for injuries to the person." The 1860 Code, like that of 1888 and Code (1974), Courts and Judicial Proceedings Article, is the law, not evidence of the law as, *e.g.,* the Codes of 1912, 1924, 1939, 1951, and 1957. *See Wash. Sub. San. Comm'n v. Pride Homes,* 291 Md. 537, 543 n.4, 435 A.2d 796 (1981). We can only surmise that since executors and administrators by the enactment of Ch. 101 of the Acts of 1798 had no power to commence and prosecute an action for slander, in the process of code revision the General Assembly determined to make the abatement statute consistent.

It must be remembered that, as Judge Aldisert put it for the Third Circuit in *Quinones v. United States,* 492 F.2d 1269, 1274 (3d Cir. 1974), "The word 'slander' is the general and original word for all kinds of defamation," notwithstanding the fact that "in modern usage it has been limited to defamation by words spoken rather than written . . . ." This begins to fall in place when one notes the

---

**2.** Code (1974) § 6-401 (a), Courts and Judicial Proceedings Article, now provides, "A cause of action at law . . . except slander, survives the death of either party." This had its origin with the enactment of Ch. 558 of the Acts of 1963, § 12 adding a new § 15 A to Code (1957) Art. 75.

beginnings for defamation actions. For example, *Folkard's Starkie on Slander and Libel* (4th Eng. ed. H. Folkard 1877), states:

> "At a very early period in the history of the English law, Slander was recognised as an individual wrong, and an offence against the public peace. Libel, however, was scarcely known; nor, indeed, is it to be supposed that it would have been, among an unlettered and illiterate people, few of whom could write, and not many could read. The offence of libel must therefore have been rare, until education and learning had made considerable advances, and with them art and science. But in rude and despotic times libel had only very narrow limits, and not the same precision it acquired in the days of liberty and science." *Id.* at 1.

That author goes on to state:

> "The term *Slander* was formerly used to embrace written as well as oral defamation; thus, in Bacon's Abridgment, *slander* is (defined to be) the publishing of words in *writing* or by speaking; by means of which the person to whom they relate becomes liable to suffer some corporal punishment, or to sustain some damage.
>
> * * *
>
> "Again, In Buller's Nisi Prius, *slander* is defined to be 'the defaming a man in his reputation, by speaking or *writing* words which affect his life, office, or trade; or which tend to his loss of preferment in marriage or service, or to his disinheritance, or which occasion any other particular damage.'" *Id.* at 3 (emphasis in original).

More recently, 1 F. Harper & F. James, *The Law of Torts* § 5.9 (1956), has stated:

> "The early law of defamation, antedating the

development and use of modern printing in England and western Europe, recognized no distinction between slander and libel. With the use of printing and its possibilities for disseminating scurrilous matter, the Star Chamber extended its criminal jurisdiction to printed defamation as tending to a breach of the peace, and at once the distinction was set up between libel and slander. By 1812 it was thoroughly established that an action would lie for a libel when one would not lie for slander, although the same ideas were conveyed in the same words. It thus developed that all libels became actionable without proof of special damage, while only certain types of slander were so actionable.

" 'If the matter were for the first time to be decided at this day,' said Mansfield, C.J., in 1812, 'I should have no hesitation in saying, that no action could be maintained for written scandal which could not be maintained for the words if they had been spoken.' " *Id.* at 372.

In *Thorley v. Lord Kerry,* 4 Taunt. 355, 364, 128 Eng. Rep. 367 (1812), from which Messrs. Harper and James were quoting, Lord Mansfield said, "But the distinction has been made between written and spoken slander as far back as *Charles* the Second's time, and the difference has been recognised by the courts for at least a century back."

M. Newell, *The Law of Slander and Libel in Civil and Criminal Cases* § 30 (3d ed. 1914), in discussing libel, says:

"In Delaware, after an elaborate discussion, it was decided that *written slander* to be actionable must impute something which tends to disgrace a man, lower him in or exclude him from society or bring him into contempt or ridicule; and that the court must be able to say from the publication itself, or such explanations as it may admit of, that it does contain such an imputation and has legally such a tendency; but mere general abuse and scurrility,

however ill-natured and vexatious, is no more actionable when written than spoken, if it does not convey a degrading charge or imputation." *Id.* at 32-33 (emphasis added).

In the Delaware case to which the author was referring, *Rice v. Simmons,* 2 Del. 417 (1838), Judge Harrington said for the court:

"The question reserved in this case presents some interesting points of consideration in the law of libel, the more interesting because of the novelty of this action in our courts. Actions on the case for *verbal* slander have been of more frequent occurrence; in the trial of which, the principles relating to that form of slander have been investigated, and to some extent settled. But the law governing civil actions for *written* slander has few precedents in the judgments of our courts; and on many points, the principles which are to govern our decisions, do not rest upon any authoritative adjudication in this country.

"Going back, then, to the common law fountain, if we are to yield to the weight of learned opinions, or recognize the force of adjudged cases, we must assent to the distinction, (regretted though it has been by high authority, and argued against, as having no foundation in reason or expediency,) between *spoken* and *written* slander. The same words which may be spoken with impunity, without subjecting to legal responsibility, may be actionable if written and published. So frequent and uniform have been the decisions founded on this distinction, that Sir James Mansfield yields to it, though reluctantly, in *Thorley* vs. *Lord Kerry,* (4 *Taunt.* 365,) as established by some of the greatest names known to the law, including *Lord Hardwicke, Hale,* chief justice, *Holt,* and others. The reasons by which this distinction has been vindicated are, that written slander is much more extensively and

permanently injurious to character than verbal, being more widely circulated; that it is, therefore, more aggravated and dangerous, as tending to breaches of the peace; and that the deliberation necessary to prepare and circulate a written slander evinces greater malice in the slanderer, and is worthy of stricter punishment." *Id.* at 422-23 (emphasis in original).

Newell also refers to definitions of slander by a number of different authorities. He quotes in one instance from *Bacon's Abridgment* as quoted by Folkard. *Id.* § 32, at 39.

1 J. Chitty, *A Treatise on Pleading* 86 (11th Am. ed. 1851) (from 6th & 7th London eds. n.d.), comments, "[A] joint action cannot be supported against two for verbal slander . . . ." 1 J. Chitty, *The Practice of the Law* 43 (1st Am. ed. 1834) (from 1st Eng. ed. n.d.), states, "Injuries to *reputation* are *written* or *verbal* slander . . . ." (Emphasis in original.)

The headnote in *Davis v. Griffith,* 4 G. & J. 342 (1832), refers to the suit as "an action upon the case for publishing a libel," but the first words written are:

"This was an action upon the case for slander. The declaration, with the necessary innuendoes, charged the defendant (the now appellant,) with publishing of, and concerning the plaintiff, (now appellee,) a certain false, scandalous, malicious, and defamatory libel, viz. 'A card. . . .' " *Id.* at 342.

Then in *Hagan v. Hendry,* 18 Md. 177, 190 (1862), Chief Judge Bowie referred for the Court to "[t]he slander, complained of, being written or printed, (not oral or verbal,) . . . ."

A number of cases outside of Maryland have referred to slander as embracing the written word. See, *e.g., Macurda v. Globe Newspaper Co.,* 165 F. 104, 107 (C.C.D. Me. 1908) ("It seems, then, that the well-known authorities in the common law of the last century used 'slander' as the more general term, and sometimes included 'libel' in the general

designation of 'slander' or 'slanderous words.'"); *Fenstermacher v. Indianapolis Times P. Co.,* 102 Ind. App. 189, 192, 1 N.E.2d 655 (1936) ("Our conclusion is that the legislature in the said act creating the Superior Court of Marion County used the word slander in its generic sense which includes the word libel."); *Johnson's Administratrix v. Haldeman, Etc.,* 102 Ky. 163, 164, 43 S.W. 226 (1897) ("The word slander is the general and original word for all kinds of defamation. One can be defamed by words spoken, words written, or by signs or pictures, and when so defamed it is called slander; and the word slander in the statute, we think, was intended to embrace all these varieties of defamation. There is nothing in the statute which shows that the word was intended to be limited in its meaning to oral slander. Webster defines slander as defamation generally, whether oral or written; but goes on to say that in modern usage it has been limited to defamation by word spoken. Bacon's Abridgement says: 'Slander is the publishing of words in writing or by speaking, by reason of which the person to whom they relate becomes liable to suffer some corporal punishment.'"); *Menter v. Stewart,* 3 Miss. 698, 699 (1838) ("A libel may be defined to be written slander. . . . We understand what is meant by a prosecution for a libel, but when the private remedy is spoken of, it is known by the name used in the statute, an action for slander."); and *Belo & Co. v. Smith,* 91 Tex. 221, 224, 42 S.W. 850 (1897) ("The question is, does the word 'slander' as used in the article include within its meaning actions for libel? The authorities leave but little doubt that at an early day in the history of the common law the term was applied both to oral and written defamations of character. Starkie on Slander and Libel, 3, and authorities there quoted. But we think it equally clear that in modern usage it is applied to oral defamation only.").

Finally, we refer to a work from our English brethren across the sea from whence came much of our law. G. Bower, *A Code of the Law of Actionable Defamation* pt. XVI, art. 64, app. 1, § 4 (2d ed. 1923), states:

"It is remarkable that 'scandal' in early times, and

afterwards 'slander,' even when they came to be applied to injury by defamation rather than to injury in general, were not used to indicate oral defamation exclusively, but always at first, and occasionally even now, as a general term. Thus in Coke's Reports (see the passage cited above) 'scandal' is used in connection with 'libelli famosi': in *Thorley* v. *Lord Kerry* (1812), 4 Taunt. 355, Sir James Mansfield, C.J., at 364, speaks of 'written and parol scandal': and Comyns' Digest and Bacon's Abridgment, define 'libel' as 'written scandal' (*a*).

"Similarly, as to the later terms 'slander' and 'slanderous.' In *Anon.* (temp. Eliz.), Owen 30, we find 'if a man *speak any slanderous words* of another,' followed by 'if a man *write any slanderous things* of another.' In the following cases the expression 'oral and written slander' is used in the judgments: *Maitland* v. *Gouldney* (1802), 2 East 425 (*per* Lord Ellenborough C.J. at p. 436, and Lawrence J. at p. 437, 'written slander'); *McGregor* v. *Thwaites* (1824), 3 B. & C. 24 (*per* Bayley, J., at p. 25); *Tuam (Bp. of)* v. *Roleson* (1828), 5 Bing. 17 (*per* Best C.J., at p. 21); *M'Pherson* v. *Daniels* (1829), 10 B. & C. 263 (at pp. 267, 272, 273, 275). In *Bell* v. *Byrne* (1811), 13 East 554, Le Blanc J., at p. 562, made use of the phrase 'whether the slander be in writing or in words.' In *Harrison* v. *King* (1817), 1 B. & Ald. 161, the expression 'verbal' (meaning 'oral') 'slander,' appears, which imports that there may be written slander. In *R.* v. *Harvey* (1823), 2 B. & C. 257, 'slanderous matter' is applied to a libellous publication. 'Verbal slander' is mentioned in *Toogood v. Spyring* (1834), 1 C. M. & R. 181 (*Cur. per* Parke B. at p. 193), 'written slander' in *Malachy* v. *Soper* (1836), 3 Bing. N. C. 371 (*Cur. per* Tindal C.J. at p. 385), and 'verbal and written slander' in *Hopwood* v. *Thorn* (1849), 8 C. B. 293 (*Cur. per* Wilde C.J. at pp. 311, 316). In *Kennedy* v. *Hilliard* (1859), 1 L. T. 578, *Little* v. *Pomeroy* (1873), Ir. R.

7 C. L. 50, and in most of the other Irish cases of this period, the term 'oral slander' (implying, of course, the existence of slander which is not oral) is frequent. Coming still nearer to the present day, we find that a judge, the soundness of whose reasoning was rivalled only by his lucidity and accuracy of exposition, Bowen L.J., at p. 316 of *Hermann Loog* v. *Bean* (1884), 26 C. D. 306, speaks of 'written slander,' 'spoken slander,' 'a slander which is contained in a document, and a slander which is not,' and, at p. 530 of *Ratcliffe* v. *Evans,* [1892] 2 Q. B. 524, 'oral slander.' The only instance of the generic use of 'slander' by the legislature is to be found in sect. 19 of 6 & 7 W. 4 cap. 76, which refers to 'slanderous or libellous matter contained in any newspaper,' obviously treating the two adjectives as either synonymous, or related to one another as genus to species. In Com. Dig. the expressions 'write slander,' and 'insert slander in an affidavit,' appear; whilst in Bacon's Abridgm. it is roundly stated that 'slander is the publishing of words in writing or by speaking,' etc. The Scotch law, which (see App. XVIII) knows no distinction between libel and slander, describes an action for libel as 'an action for damages for slander': see, for instance, *Ellis* v. *National Free Labour Assocn.* (1905), 7 F. 629; *Browne* v. *D. C. Thomson & Co.,* [1912] S. C. 259.

"However, notwithstanding that both reason and authority would amply justify the use of the term 'slander' to designate the genus, it cannot be denied that general usage, convenience, and the legislature have now definitely dedicated the word to one species only, viz. oral defamation." *Id.* at 232-33 (emphasis in original).

Given what we believe from that which we have quoted and cited to have been the understanding of the word "slander" at the time of the original enactments in 1798 and 1860, and the references by our predecessors of the last century to

"slander" as embracing what we would understand today as an action in libel, we conclude that the action of Bartlett in this case abated at his death.

> *Judgment of the Court of Special Appeals dismissing the appeal affirmed; costs to be equally divided between the parties.*