590 A.2d 1094

**In re ADOPTION NO. 90072022/CAD in the Circuit Court for Baltimore City.**

**No. 1473, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

June 4, 1991.

Anthony R. Mignini (Mignini, Raab and Lidinsky, on the brief), Baltimore, for appellants.

No appellee involved.

Argued before ALPERT, BLOOM and ROSALYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

A very young boy asked the Circuit Court for Baltimore City to enter a decree to make him a part of a new family by approving his adoption by his soon-to-be stepfather. That court said, "No—you must wait." We conclude that the court erred. It is too late to change what happened to

this little boy, but we hope that this decision will prevent a similar happening for some other little boy or girl.

John and Mary[1] planned to be married in May of 1990. Mary had a little boy, Mark, born out of wedlock in April of 1985. Mary is Catholic; John is Methodist. Their plans included a Catholic wedding and a commitment to raise Mark in the Catholic faith. Their intention was to announce the adoption to their families at the wedding so that all would know they were a family in every sense of the word. The adoption would also permit Mark to register to start school with his new name.

Two months before the wedding, John and Mary filed a joint petition to adopt Mark. They attached the consent forms of Mary and the natural father of Mark. They asked for a waiver of referral and investigation by the Adoption and Custody Unit of the Court and for a hearing on the motion. This was not to be. Instead, apparently at the time of filing, counsel was told by an employee of the Adoption and Custody Unit "that a home study is necessary and that the couple would be required to be married one year before an adoption would be recommended." If a hearing did occur, it was not of sufficient import to enter it on the docket. Moreover, if a hearing did occur, the motion to waive referral and investigation was clearly denied.[2]

On April 23, 1990, still in time to approve the adoption before the wedding, counsel filed the investigative report of Catholic Charities. That report could scarcely have been more positive. The in-depth report covered John's and Mary's educations, employment histories, parenting philosophies and general backgrounds. It included such details as the fact that John and Mary met in 1988, became engaged

---

**1.** We have changed even the first names of all those intimately involved in this case for obvious reasons.

**2.** Arguably, a home study was unnecessary as Mark was then living with his mother and would continue to live with the mother after the adoption. Whether a home study in this type of situation is the best use of limited resources should be considered.

in April of 1989, and planned a May 1990 wedding. John knew from mutual friends that Mary had a son from a previous relationship even before he met her. When they met, Mark was three years old and began calling John "Daddy" even before John and Mary were engaged. They had already purchased a home in which John was then living. This would be their home following the wedding. The report went on to say that Mark has no relationship with his biological father and Mark was unaware of his existence.[3] The investigator, under the heading "Motivation to Adopt," said that Mary and John "feel thoroughly committed to each other and to [Mark] and wish to make their wedding a true family union." The report also stated: "It seems apparent that a genuine father-son relationship already exists between [John] and [Mark]."

The report rested somewhere within the confines of the courthouse for almost four months until August 17, 1990 when the following note was added to the unsigned decree of adoption:

"Reserved. This adoption is premature. At the time it was filed the parties requesting the adoption were not married. To determine stability of the marriage at least a year must elapse before the court will consider the adoption."

Recognizing that an adoption is largely a discretionary matter, John and Mary ask this Court only whether the trial judge abused her discretion in reserving a decision regarding adoption based on the marital status of the petitioners and the duration of their marriage.

■ Before discussing this issue, we must deal with a jurisdictional question: whether the reservation of this adoption is appealable. Generally, appeals lie only from

---

**3.** Most authorities believe a child should know that he or she is adopted as early as possible. Even if Mark did not know of his natural father prior to any adoption, this would seem an ideal time to introduce the subject. Certainly, it would be essential if a hearing were conducted and/or a change of name accomplished.

final judgments. Md.Cts. & Jud.Proc.Code Ann. § 12–301 (1974, 1989 Repl.Vol.). Whether a decision amounts to a final judgment is a difficult determination. In defining finality, the Court of Appeals has stated that "the judgment must be so final as to determine and conclude rights involved, or deny the appellant means of further prosecuting or defending his rights and interests in the subject matter of the proceeding." *United States Fire Ins. Co. v. Schwartz*, 280 Md. 518, 521, 374 A.2d 896 (1977).[4] This order simply does not meet that standard, nor is it one of the interlocutory orders for which an appeal will lie under Md.Cts. & Jud.Proc.Code Ann. § 12–303 (1974, 1989 Repl. Vol.).[5] We do hold, however, that this order meets the collateral order doctrine exception established in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), which "treats as final and appealable a limited class of orders which do not terminate the litigation in the trial court." *Public Service Comm'n v. Patuxent Valley Conservation League*, 300 Md. 200, 206, 477 A.2d 759 (1984).

The circuit court's order of August 17, 1990 was not simply an order postponing the decision. It stayed the consideration of the adoption. The order denied the parties the right to adopt the child contemporaneously with their marriage solely because the parties were not married at the time of the petition and had not been married for a year.

In *County Commissioners v. Schrodel*, 320 Md. 202, 211, 577 A.2d 39 (1990), the Court of Appeals reiterated the four requirements for an order to be appealable under the collateral order doctrine:

---

4. Even though the holding in *Schwartz* was overruled by *Department of Public Safety and Correctional Services v. LeVan*, 288 Md. 533, 544, 419 A.2d 1052 (1980), this definitional standard was specifically approved in *Cant v. Bartlett*, 292 Md. 611, 614, 440 A.2d 388 (1982).

5. We do not prejudge whether some other form of review was available to John and Mary.

" '[T]he order must [ (1) ] conclusively determine the disputed question, [ (2) ] resolve an important issue [, (3) be] completely separate from the merits of the action, and [ (4) ] be effectively unreviewable on appeal from a final judgment.' " (Citations omitted.) (Brackets in original.)

In the instant case, the order of August 17, 1990 meets all four requirements. (1) It conclusively determined that John could not adopt Mark until a year after John and Mary married, *see Schrodel*, 320 Md. at 212, 577 A.2d 39. (2) The order resolved a very important question for Mark, namely that he could not be a full part of the family unit for a year, nor would his name be the same as his mother and the only father he knew. (3) The postponement based on the time element was totally separate from the merits of the case, although the court dealt with it as determinative. (4) The action of the court would be effectively unreviewable on appeal from a final judgment because, once the adoption was refused or permitted, the time issue would have become moot. Thus, we hold that the circuit court's order of August 17, 1990 is appealable under the collateral order doctrine.

—Marriage—

■ The trial court ostensibly refused to rule on the adoption because John and Mary were not married for one year at the time of the filing of the petition. Md.Fam.Law Code Ann. § 5–309 (1984), provides:

"(a) **Right to Petition to Adopt.**—Any adult may petition a court to decree an adoption.

"(b) **Adoption by single individual.**—A court may not deny a petition for adoption solely because the petitioner is single or does not have a spouse."

In *Bridges v. Nicely*, 304 Md. 1, 11, 497 A.2d 142 (1985), the Court of Appeals stated:

"The cornerstone of the Maryland Adoption statute, §§ 5–307(a) and 5–309(a), defining who may be adopted and who may adopt, expresses in broadly worded terms, without qualification or restriction concerning blood rela-

tionships, that '[a]ny individual ... may be adopted' by '[a]ny adult.'" (Brackets in original).

The Court of Appeals went on to comment:

"Professor John S. Strahorn, in his well-regarded article on 'Adoption in Maryland,' 7 Md.L.Rev. 275 (1943), analyzed the then existing adoption statute which, in its most fundamental provisions, does not materially differ from our present statute. He said:

'The Maryland statute ... recognizes that petitions may be filed by an individual severally, be he or she married, widowed, divorced, or single....'"

*Bridges,* 304 Md. at 11, 497 A.2d 142. The statute does not require that the petitioner be married.

—One–Year Waiting Period—

■ No legal authority exists to require petitioners for adoption, once married, to wait one year before a court will consider them fit to adopt. The possible negative effects of approving any stepparent adoption include (1) loss of support from the biological parent; (2) loss of the possibility of securing support from the biological parent; (3) loss of the possibility of inheritance from the biological parent and collateral relatives; (4) loss of the relationship with the biological parent; and (5) the possibility of an emotional setback to the child if the stepparent divorces the natural parent.

In this case, the trial judge knew nothing of the first three potential losses, but if they were of concern to her, she could have inquired to determine their impact. She did know that John was willing to take on the responsibility of supporting Mark. The trial judge also knew that Mark had no relationship, contact or even knowledge of his natural father. Therefore, the loss of this relationship could scarcely be of concern to the trial judge. She also knew that the only "Daddy" Mark knew was John. If the relationship between John and Mary fails, Mark could be the biggest loser. Even if a failure occurred during the first year, the trial judge could not be sure John would want to drop his

relationship with Mark. She did know, however, that if the adoption had not taken place John could not insist on his right to maintain the relationship under those circumstances. The possible losses to Mark if John's and Mary's relationship fails will be no different on May 12, 1991 than they were on May 12, 1990. The likelihood that this or any other marriage will endure has very little to do with whether the couple makes it through the first year, but a great deal to do with their basic attitudes toward marriage, how they resolve disputes and deal with obstacles, and their communication skills and religious commitment.

We do not mean to be read to say that every stepparent adoption should be approved. Certainly some are undertaken with little understanding of what is involved in being a parent and with the impression that the symbolism of the adoption can substitute for the commitment to the difficult job of parenting. Moreover, in many stepparent adoptions, the child has an on-going relationship with the biological parent that will be severed if the adoption is approved. Some studies have suggested that this may result in low self-esteem for the child. *See, e.g.,* Wolf and Mast, "Counseling Issues in Adoptions by Stepparents" 32 *Social Work* 69 (Jan.–Feb.1987).

Neither concern seems applicable to this case. The investigative report of Catholic Charities indicates that John and Mary have discussed and agreed upon child rearing and discipline techniques. John and Mary have similar beliefs and have given a great deal of consideration to the values they wish to instill in Mark. Clearly, John is committed to being Mark's parent. Additionally, Mark has had no relationship with his biological father and, in fact, does not know of his existence. Severing Mark's biological father's rights at this point simply gives legal sanction to the existing state of facts. Any negative impact on Mark would more than likely have resulted from the lack of contact with his biological father before the adoption rather than result from the legal ramifications of the adoption itself.

The petitioners in the instant case were engaged to be married at the time they filed their petition to adopt Mark. One of the petitioners was Mark's natural mother, in whose care and custody he had been since birth. Pursuant to Md.Est. & Trusts Code Ann. § 1–207(a) (1974), she would have forfeited no rights had the trial court granted the adoption. Mark's natural father had properly consented to the adoption; Mark had no contact or knowledge of that natural father; and Mark would be John's stepson and living in the home regardless of whether the adoption was granted.

Certainly, the trial judge should be concerned about Mark's adoption in view of a long line of cases holding that the child's welfare and best interests should be primary considerations in an adoption. *Cf. Hicks v. Prince George's County Dept. of Social Services,* 281 Md. 93, 100, 375 A.2d 558 (1977), *Lloyd v. Schutes,* 24 Md.App. 515, 521, 332 A.2d 338 (1974), *cert. denied,* 275 Md. 752 (1975). Although Rule D75 mandates an investigation only in contested cases, it was appropriate and within the court's discretion to order one in the instant case. The decision of the court to defer ruling on this case until the marriage had lasted one year, however, was purely arbitrary. That is particularly patent in view of the glowing investigative report. John and Mary were entitled to have the court look at them as individuals. The court could hold a hearing, if needed, to make a decision that would be in the best interests of this child. John and Mary did not deserve to have the decision postponed based on an arbitrary policy. We fail to see how this policy served the best interests of Mark.

We do not acquiesce in a decision based on the policy that a year of marriage is necessary to be certain the relationship is stable. This general policy decision does encourage efficiency by avoiding a hearing to assess whether postponing an adoption is actually warranted. To accept this substitution of policy for a hearing states what unfortunately may be so: the courts are too congested to assign sufficient judicial personnel to family matters. We should

not, however, complacently institutionalize the practice of allowing family matters to come last in the court's assignment of resources.

We find it ironic that, assuming the wedding took place as planned, John and Mary had been married just two days short of one year on the day of the hearing in this case.

ORDER OF AUGUST 17, 1990 REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLANTS. MANDATE TO ISSUE FORTHWITH.