# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CYTOTHERYX, INC., <br><br> Plaintiff, <br><br> v. <br><br> CASTLE CREEK BIOSCIENCES, INC. and PARAGON BIOSCIENCES, LLC, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) C.A. No. 2023-1142-PAW <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| CASTLE CREEK BIOSCIENCES, INC. and PARAGON BIOSCIENCES, LLC, <br><br> Defendants, <br> Counterclaimants, <br> and Third-Party Plaintiffs, <br><br> v. <br><br> CYTOTHERYX, INC. and JOHN SWART, <br><br> Plaintiff, Counter-Defendant, <br> and Third-Party Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Submitted: October 17, 2025
Decided: November 10, 2025

*Upon Third-Party Defendant's Motion to Dismiss;*
**GRANTED, WITHOUT PREJUDICE.**
*Upon Counterclaim Defendant's Motion to Dismiss or Stay;*
**DENIED.**

## MEMORANDUM OPINION AND ORDER

Gary W. Lipkin, Esq.; Michelle C. Streifthau-Livizos, Esq.; and Courtland C. Merrill, Esq., of Saul Ewing LLP, *Attorneys for Plaintiff and Counterclaim Defendant Cytotheryx, Inc.*

Adam V. Orlacchio, Esq.; James G. Gorman III, Esq.; Gregory P. Ranzini, Esq.; and William J. Dorsey, Esq., of Blank Rome LLP, *Attorneys for Defendants, Counterclaimants, and Third-Party Plaintiffs Castle Creek Biosciences, Inc. and Paragon Biosciences, LLC.*

Marc S. Casarino, Esq.; and Katie Barksdale, Esq., of Kennedys CMK LLP, *Attorneys for Counterclaim Defendant Cytotheryx, Inc. and Third-Party Defendant John Swart.*

**WINSTON, J.**[1]

---

[1] Sitting as a Vice Chancellor of the Court of Chancery by designation of the Chief Justice pursuant to *In re: Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. Nov. 4, 2024), most recently extended in the Fifth Amended Order dated May 30, 2025.

## I.  INTRODUCTION

This action stems from the sale of a Cytotheryx subsidiary to Counterclaimants pursuant to a merger agreement.  After the sale, Cytotheryx filed a lawsuit alleging that Counterclaimants made misrepresentations in negotiations.  Then, Cytotheryx and its CEO issued an internet press release announcing the lawsuit and making related statements about Counterclaimants.  Counterclaimants brought claims against Cyotheryx and Swart alleging their statements in the press release were defamatory.  Cytotheryx and Swart now move to dismiss those Counterclaims.

The motions raise three primary questions:

First, which state's law applies to the Counterclaims?  The Court concludes that Delaware law applies, because the Counterclaims are encompassed in the broad choice-of-law provision the parties chose in the Merger Agreement.  Contrary to Cytotheryx's and Swart's contentions, the interests of Illinois, where one Counterclaimant is headquartered, do not overcome this contractual choice.

Second, do the Counterclaims state claims for defamation under Delaware law?  At this early stage, the Court concludes that they do.

Third, does Delaware have personal jurisdiction over Swart, a non-resident?  The Court concludes that it does not.  Delaware's Officer Consent Statute provides a statutory hook, but exercising jurisdiction over Swart would be inconsistent with

the Fourteenth Amendment's due process clause. There are no allegations that Swart made the statements in the internet press release while in Delaware or purposefully directed his conduct here. Accordingly, Delaware lacks the requisite minimum contacts to assert jurisdiction over Swart.

Cytotheryx's motion to dismiss for failure to state a claim is **DENIED**, and Swart's motion to dismiss for lack of jurisdiction is **GRANTED WITHOUT PREJUDICE**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    THE PARTIES

Counterclaimant Castle Creek Biosciences, Inc. ("Castle Creek") is a Delaware Corporation with its principal place of business in Pennsylvania.[3]

Counterclaimant Paragon Biosciences, LLC ("Paragon" and, with Castle Creek, "Counterclaimants") is a Delaware LLC with its principal place of business in Illinois.[4]

---

[2] The facts are drawn from the Counterclaims and the documents incorporated therein. *See* D.I. 28, at 19-27 (hereinafter "Counterclaims"). The Court accepts as true the well-pled facts in the Counterclaims solely for purposes of the present motions to dismiss. The Court also references the Answer (*see id.* at 1-18 (hereinafter "Answer")) and the Complaint in this action, but it does so solely for the purposes of discussing the context of the parties' disputes.

[3] Counterclaims ¶ 5.

[4] *Id.* ¶ 6.

Counterclaim Defendant Cytotheryx, Inc. ("Cytotheryx") is a Delaware corporation with its principal place of business in Minnesota.[5]

Third-party defendant John Swart is the co-founder and CEO of Cytotheryx and resides in Minnesota.[6]

### B.    THE UNDERLYING TRANSACTION AND THIS ACTION

On November 19, 2021, Castle Creek acquired novavita thera, Inc. from Cytotheryx pursuant to a merger agreement (the "Merger Agreement").[7]  As payment, Castle Creek assigned shares in Castle Creek to Cytotheryx.[8]

Cytotheryx filed its first amended complaint in this action in January 2024 (the "FAC").  The FAC alleged that in the course of negotiating the transaction Counterclaimants made misrepresentations about Cytotheryx's ability to redeem the Castle Creek shares it received as payment.[9]

### C.    THE ALLEGED DEFAMATORY STATEMENT

In addition to filing this action, Cytotheryx and Swart submitted a press release to EIN Presswire.[10]  That press release—which was published in January

---

[5] *Id.* ¶ 3.

[6] *Id.* ¶ 4.

[7] Answer ¶ 9.

[8] *Id.* ¶ 10.

[9] *See* Verified First Am. Compl. (D.I. 7) ¶¶ 4, 17-19 (hereinafter "FAC").

[10] Counterclaims ¶ 12.

2025, shortly after the FAC was filed—announced the lawsuit and made certain related statements about Counterclaimants.[11] In the portion relevant to the Counterclaims, the press release quotes Swart as follows:

> "We are shocked and disappointed in the failure of Castle Creek to meet its contractual obligations after the acquisition of novavita thera in 2021," stated John Swart, Cytotheryx President and CEO. "The misrepresentations provided during the acquisition process by Castle Creek and Paragon Biosciences' leadership teams, along with their refusal to provide payment under the contract terms, is not consistent with the actions of a financially stable company who adheres to their contractual obligations. We intend to pursue all available remedies under the law, to protect our investor's interests and further enable our continuing research and development activities addressing liver failure."[12]

Counterclaimants do not allege that Swart was physically present in Delaware when he made these statements.

### D. THE MERGER AGREEMENT'S CHOICE-OF-LAW PROVISION

The Merger Agreement governing the transaction contains a choice-of-law provision. Specifically, Section 11.8(a) provides:

> This Agreement and all claims and causes of action based upon, arising out of or in connection herewith shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without regard to Laws that may be applicable under conflicts of laws principles (whether of the State of Delaware or any other jurisdiction) that

---

[11] *Id.*; Counterclaims, Ex. C.

[12] Counterclaims, Ex. C.

would cause the application of the Laws of any jurisdiction other than the State of Delaware.[13]

## E.    PROCEDURAL HISTORY

In the FAC, Cytotheryx brought claims for common law fraud and promissory estoppel.[14]   The Court denied Counterclaimants' motion to dismiss the FAC.[15] Thereafter, Counterclaimants filed their Answer and Counterclaims for defamation *per se* and defamation.[16]

Cytotheryx and Swart now move to dismiss the Counterclaims.[17]   They argue, first, that the Counterclaims fail to state a claim against either of them under Rule 12(b)(6).   Second, they argue under Rule 12(b)(2) that the Court lacks personal jurisdiction over Swart.   In the alternative, Cytotheryx and Swart contend that the Court should stay proceedings on the Counterclaims until after Cytotheryx's own claims are adjudicated.   Counterclaimants responded,[18] and Cytotheryx and Swart

---

[13] D.I. 43, Ex. A.

[14] *See* FAC ¶¶ 4, 30-40.

[15] *See* D.I. 24.

[16] D.I. 28.

[17] *See* D.I. 31; D.I. 33; D.I. 37 (hereinafter "Op. Br."); D.I. 39.

[18] D.I. 43 (hereinafter "Ans. Br.").

filed a reply.[19] The Court heard oral argument on June 27, 2025, and reserved its

decision.[20]

---

[19] D.I. 45 (hereinafter "Reply"). After briefing was completed, Cytotheryx filed the now-operative Second Amended Complaint ("SAC"), which adds claims for breach of contract and breach of the "duty of good faith and fair dealing." *See* D.I. 56 ¶¶ 4, 51-66. When answering the SAC, Counterclaimants also restated their counterclaims, but they made clear that they were doing so "without alteration or amendment." *See* D.I. 57, at 30 n.1. Accordingly, this opinion applies to the Counterclaims as filed in both D.I. 28 and D.I. 57.

[20] On June 3, 2025, the Court contacted the parties to *sua sponte* raise the issue of the Court's subject matter jurisdiction over the Counterclaims. D.I. 55. At oral argument, the parties indicated that their position is that "this case [i.e., the defamation counterclaims] should be heard in the same court [as Cytotheryx's claims], under the same rules, with probably the same trial if it comes to that." *See* D.I. 58, at 5:4-9. To confirm its understanding following that discussion, the Court requested that each party state in writing "whether (i) to the extent that the counterclaims proceed in this Court, the party agrees to waive its right to a jury trial over them; and (ii) if the counterclaims were transferred to the Superior Court—where jury trials are available—the party would agree to waive its right to a jury trial in that court as well." D.I. 63. All parties confirmed that they would waive their right to a jury trial in both circumstances. D.I. 64; D.I. 65. Even in a similar scenario, this Court has declined to exercise its discretion under the clean-up doctrine to retain jurisdiction. *See DG BF, LLC v. Ray*, 2021 WL 2742582, at *1-2 (Del. Ch. June 30, 2021). It has so declined on the basis that "the historical imperative that a jury, not a judge, should evaluate whether a defendant's statements are defamatory shines even brighter" than the efficiency goals of the clean-up doctrine. *Id.* at *2 (quoting *Smith v. Scott*, 2021 WL 1592463, at *14 (Del. Ch. Apr. 30, 2021)). The Court here exercises its discretion differently due to the unique circumstances of this case. If the Court were to decline jurisdiction over the defamation Counterclaims, they would be transferred to the Superior Court. The jurist presiding over this case is a Judge of the Superior Court who is specially designated to sit as a Vice Chancellor. In the Superior Court, a party could elect to have the defamation claims heard by a jury, but the Superior Court does not force litigants to so elect, and the parties have represented to the Court that they would not do so. *See, e.g.*, *NewWave Telecom & Techs., Inc. v. Jiang*, 2023 WL 6548673, at *2, *7, *9 (Del. Super. Sept. 27, 2023) (issuing post-trial decision on defamation claims following bench trial); *Masterson-Carr v. Anesthesia Servs., P.A.*, 2015 WL 5168557, at *1, *16-18 (Del. Super. Aug. 28, 2015) (same). The more practical route is to exercise jurisdiction under the Court of Chancery's clean-up doctrine, and the Court does so here.

The Court is aware that the Court of Chancery has written that it "in all instances, lacks subject matter jurisdiction to adjudicate" certain elements of defamation. *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *1 (Del. Ch. June 27, 2019) (citing *Organovo Hldgs.,*

## III.   STANDARD OF REVIEW

Upon a motion to dismiss under Rule 12(b)(6), the Court (i) accepts all well-pled factual allegations as true, (ii) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[21]   The Court does not, however, accept conclusory allegations that lack specific supporting factual allegations.[22]

"Defamation claims require additional scrutiny at the dismissal stage because dismissal under Rule 12(b)(6) 'not only protects against the costs of meritless

---

*Inc. v. Dimitrov*, 162 A.3d 102 (Del. Ch. 2017)).   This "all instances" language from *Perlman* could be read to mean that this Court cannot adjudicate defamation claims even under the clean-up doctrine.   Yet after *Perlman*, the Court of Chancery utilized the clean-up doctrine to adjudicate a defamation claim, suggesting that this Court retains discretion do so.   *See Laser Tone Bus. Sys., LLC*, 2019 WL 6726305, at *13-15 & n.177 (Del. Ch. Nov. 27, 2019); *see also Invictus Glob. Mgmt., LLC v. Corbin Capital P'rs, L.P.*, 2025 WL 2419577, at *20 (Del. Super. Aug. 21, 2025) (explaining that the Court of Chancery has "in its discretion" exercised the clean-up doctrine "to hear defamation claims," and citing *Laser Tone*).

[21] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs., LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[22] *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998) (citing *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993)).

litigation, but provides assurance to those exercising their First Amendment rights.'"[23]

When a defendant invokes Rule 12(b)(2) to seek a complaint's dismissal for lack of personal jurisdiction, "[t]he plaintiff has the burden to show a basis for the Court's jurisdiction over the nonresident defendant."[24] In determining whether a plaintiff has met its burden, the Court engages in a two-pronged inquiry: first, it must "determine that service of process is authorized by statute," and "then must determine that the exercise of jurisdiction over the nonresident defendant comports with traditional due process notions of fair play and substantial justice."[25] The plaintiff has the burden to prove that these two steps are satisfied as to each defendant.[26]

## IV. ANALYSIS

There are three principal disputes on these motions. The first is a threshold issue: which law applies to the Counterclaims? Cytotheryx and Swart suggest

[23] *Whittington v. Whittington*, 2024 WL 490807, at *2 (Del. Super. Feb. 8, 2024) (quoting *ShotSpotter Inc. v. VICE Media, LLC*, 2022 WL 2373418, at *6 (Del. Super. June 30, 2022)).

[24] *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Trust U/A/D/ June 21, 2002*, 2017 WL 3575712, at *4 (Del. Ch. Aug. 18, 2017) (quoting *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008)).

[25] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citations omitted).

[26] *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2020 WL 3564622, at *10 (Del. Ch. June 29, 2020).

Illinois law, or alternatively Pennsylvania law, applies.[27] Counterclaimants argue that Delaware law applies.[28]

The second dispute concerns whether the Counterclaims state claims for defamation (under whatever law does apply). Cytotheryx and Swart argue that the Counterclaims do not.[29] Counterclaimants contend that they do.[30]

The third dispute concerns personal jurisdiction, specifically, whether this Court has it over Swart. Cyotheryx and Swart argue that the Court does not, either under Delaware statute or under the Fourteenth Amendment's due process clause.[31] Counterclaimants retort that two Delaware statutes apply and that exercising jurisdiction over Swart satisfies due process too.[32]

The Court tackles each of these disputes below. After that, the Court briefly addresses Cytotheryx's and Swart's alternative request for a stay of the Counterclaims.

---

[27] *See* Op. Br. at 8-14.

[28] *See* Ans. Br. at 5-9.

[29] *See* Op. Br. at 15-26; Reply at 7-15.

[30] *See* Ans. Br. at 9-22.

[31] *See* Op. Br. at 26-29; Reply at 16-18.

[32] *See* Ans. Br. at 22-28.

## A.    DELAWARE LAW APPLIES.

Before the Court can determine whether the Counterclaims state a claim for defamation, it must decide which State's law applies to those claims. Counterclaimants argue that Delaware law applies because the parties chose it in the Merger Agreement.[33] Cytotheryx and Swart disagree and argue for the law of Illinois or, as a backup, Pennsylvania.[34] They contend that defamation claims are not encompassed by the Merger Agreement's choice-of-law provision.[35] And even if they were, Cytotheryx and Swart assert, that contractual choice would not control; instead, the Court should consider other factors, chief among them the locations of Counterclaimants' headquarters.[36] Because Paragon is the "parent" company of Castle Creek,[37] the law of the state of Paragon's headquarters—Illinois—should apply, say Cytotheryx and Swart.[38] If not Illinois, Cytotheryx and Swart suggest, the law of Pennsylvania, where Castle Creek is headquartered, would apply.[39]

---

[33] *Id.* at 5-9.

[34] *See* Op. Br. at 8-14.

[35] *See* Reply at 3-4.

[36] *See* Op. Br. at 10-14; Reply at 2-6.

[37] Counterclaimants dispute that Paragon is Castle Creek's parent company. *See* Ans. Br. at 8 n.1. The Court's decision, set forth below, does not depend on the precise nature of the corporate relationship between Paragon and Castle Creek.

[38] *See* Op. Br. at 13-14; Reply at 5-6.

[39] *See* Op. Br. at 8, 13; Reply at 11.

Delaware courts must address "three threshold elements" in a choice-of-law analysis.[40]   Those elements are: (i) "determining if the parties made an effective choice of law through a contract;" (ii) "if not, determining if there is an actual conflict between the laws of the different states each party urges should apply;" and (iii) "if so, analyzing which state has the most significant relationship" to the disputed issue.[41]   Accordingly, this Court begins with the parties' contract and only afterwards considers other factors.

### 1.    THE MERGER AGREEMENT'S CHOICE-OF-LAW PROVISION APPLIES TO THE COUNTERCLAIMS.

The parties do not dispute that the Merger Agreement contains a valid choice-of-law provision.[42]   Their dispute lies in whether that choice-of-law provision applies to Counterclaimants' defamation claims,[43] which arise in tort rather than contract.

"With respect to tort claims that relate to a contract, the Court must determine whether the scope of the choice-of-law provision is broad enough to encompass

---

[40] *Travelers Indem. Co. v. CNH Indus. Am., LLC*, 191 A.3d 288, 2018 WL 3434562, at *3 (Del. 2018) (TABLE).

[41] *Id.* (quoting *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017)).

[42] *See* Ans. Br. at 6; Reply at 2-5 (arguing only that the choice-of-law provision does not apply, not that it is invalid).

[43] *See* Ans. Br. at 5-9; Reply at 2-5.

those claims arising from the parties' contractual relationship."[44]  Like with other questions of contract interpretation, the Court starts, and often ends, with the contract's plain language.[45]

The Merger Agreement's choice-of-law provision provides that Delaware law will apply to "all claims and causes of action based upon, arising out of or in connection []with" the Merger Agreement.[46]  That language—particularly "arising out of" and "in connection []with"—is "paradigmatically broad."[47]  Indeed, the question of whether a choice-of-law provision applies to torts has turned on whether the contract contained similar language.  When the contract does not, Delaware courts have held the provision does not apply.[48]  The implication, borne out by

---

[44] *Ramco Asset Mgmt., LLC v. USA Rare Earth, LLC*, 2024 WL 1716399, at *7 (Del. Ch. Apr. 22, 2024) (citing *Gloucester Hldg. Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 124 (Del. Ch. 2003)).

[45] *See, e.g.*, *id.* at *8 (analyzing "[t]he plain language" of choice-of-law provision to determine its scope); *SeaWorld Entm't, Inc. v. Andrews*, 2023 WL 3563047, at *3 (Del. Ch. May 19, 2023) ("To determine what contractual parties intended, Delaware courts start with the text.  And if the text is unambiguous, Delaware courts end there too." (cleaned up)), *aff'd*, 314 A.3d 662 (Del. 2024) (TABLE).

[46] Ans. Br., Ex. A § 11.8(a).

[47] *Lillis v. AT & T Corp.*, 904 A.2d 325, 331 (Del. Ch. 2006) (referencing the phrases "connecting with," "relating to," and "arising out of").

[48] *See, e.g.*, *Gloucester*, 832 A.2d at 124 (holding choice-of-law clause did not apply because it "does not claim to cover litigation that *arises out of or relates to*" the contract); *Huffington v. T.C. Grp., LLC*, 2012 WL 1415930, at *11 (Del. Super. Apr. 18, 2012) ("The choice of law provision, without language such as '*arising out of or relates to*,' only requires the Court to apply Delaware law to claims challenging the terms and provisions of the Subscription Agreement.").

though not always explicitly stated in the case law, is that when a choice-of-law provision *does* contain this broad language, it *does* cover tort claims.[49] Here, the Court holds that the Merger Agreement's choice-of-law provision is broad enough to cover at least some tort claims.

The question remains, however, whether the choice-of-law provision covers *these particular* tort claims. Cytotheryx and Swart contend that extending the choice-of-law clause to defamation claims is a bridge too far. That is because, they contend, defamation is "an extracontractual tort arising post-agreement," whereas the types of torts to which choice-of-law provisions apply generally are those "integrally connected with contract formation or validity."[50] True, in a vacuum, contractual choice-of-law provisions are less likely to apply to claims for defamation than for fraudulent inducement. A claim for fraudulent inducement necessarily arises out of a contract; one for defamation only possibly does. Stepping out of the vacuum and back into the particulars of this case, Counterclaimants' defamation

---

[49] *See, e.g.*, *VGS, Inc. v. Castiel*, 2003 WL 723285, at *7-8 & n.29 (Del. Ch. Feb. 28, 2003) (applying New York law to fraud claims where contract's choice-of-law clause chose New York law "for any litigation arising out of or relating to thus [*sic*] Agreement and transactions contemplated hereby"); *see also VSI Sales, LLC v. Int'l Fidelity Ins. Co.*, 2015 WL 5568623, at *3 (D. Del. Sept. 22, 2015) ("Delaware courts examine whether the contracting parties drafted the provision broadly or narrowly. Courts have held that choice-of-law provisions that explicitly apply to 'any claim arising out of or relating to' a contract are broad enough to cover quasi-contract and tort claims arising from contractual agreements." (citations omitted)).

[50] Reply at 3-4.

claims arise out of and are connected to the Merger Agreement. They concern statements about Counterclaimants' "contractual obligations" and performance, including accusing Counterclaimants of providing "misrepresentations" during the "acquisition process" and "refus[ing] to provide payment under the contract terms."[51] Had Cytotheryx and Swart made statements about some other topic, the result might be different. But they made statements about the performance of the Merger Agreement, so the ensuing defamation claims are encompassed by the Merger Agreement's broad choice-of-law provision.

### 2. THERE ARE NO EXCEPTIONS TO INVALIDATE THE PARTIES' CONTRACTUAL CHOICE OF LAW IN THIS CASE.

Having held that the Merger Agreement's choice-of-law provision applies, the Court now considers whether there are any exceptions to that contractual choice.

"'Delaware courts will not easily invalidate' a choice of law provision . . . ."[52] There are, however, exceptions to enforcing a choice-of-law provision in Section 187 of the Restatement (Second) Conflicts of Law, which Delaware courts follow.[53] These exceptions apply if:

---

[51] Counterclaims, Ex. C.

[52] *Sycamore P'rs Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 761639, at *7 (Del. Super. Feb. 26, 2021) (quoting *Change Capital P'rs Fund I, LLC v. Volt Elec. Sys., LLC*, 2018 WL 1635006, at *8 (Del. Super. Apr. 3, 2018)).

[53] *Troy Ventures, LLC v. Kosloski*, 2025 WL 1172758, at *10 (Del. Super. Apr. 21, 2025).

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice-of-law provision.[54]

The "party seeking to invalidate" the contractual choice-of-law provision "bears the burden" of showing that one of these exceptions apply.[55]

The first exception does not apply. By statute, the Court must presume that Delaware has a "significant, material and reasonable" relationship to the transaction.[56] Even absent this statutory obligation, Delaware has a substantial and reasonable relationship to the Merger Agreement and the parties thereto, because the relevant parties to the Merger Agreement are all Delaware entities.[57]

The second exception does not apply either. Under this exception, Cytotheryx and Swart bear the burden of showing: (1) Illinois would be the "default" state but

---

[54] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 803 (Del. Ch. 2020) (quoting Restatement (Second) of Conflict of Laws § 187 (Am. Law Inst. 1971) (hereinafter "Restatement")).

[55] *See Sycamore*, 2021 WL 761639, at *7 (citing *Change Capital*, 2018 WL 1635006, at *6).

[56] 6 *Del. C.* § 2708(a).

[57] *Focus Fin.*, 241 A.3d at 804 ("Focus Parent is a Delaware limited liability company, making Delaware its domicile. Under the *Restatement*, that connection provides a reasonable basis for selecting Delaware law." (citing Restatement § 187 cmt. f)).

for the choice-of-law provision, (2) enforcement of the choice-of-law provision would be contrary to fundamental Illinois public policy, and (3) Illinois has a materially greater interest than Delaware in the enforcement or non-enforcement of the provision.[58] Cyotheryx and Swart have not borne their burden.

It is unclear whether Illinois would be the "default" state here absent the choice-of-law provision. Cytotheryx and Swart argue that there is a presumption that the state of the plaintiff "parent" company, here Illinois, is the default state in a defamation action.[59] Yet the Court must consider other factors as well.[60] And, here, other states have interests at play. These include Pennsylvania, which is the state where the other plaintiff is headquartered, and Delaware, whose interests are further outlined below. Nonetheless, the Court assumes for the sake of analysis that Illinois is the "default" state.

Taking the remaining two elements together, the Court considers whether enforcing the Merger Agreement would violate fundamental Illinois public policy

---

[58] *Sycamore*, 2021 WL 761639, at *7.

[59] *See* Op. Br. at 11-14 (first citing Restatement § 150; and then citing *US Dominion, Inc. v. Newsmax Media, Inc.*, 2025 WL 211497 (Del. Super. Jan. 16, 2025)).

[60] *See US Dominion*, 2025 WL 211497, at *3 (noting presumption of plaintiff's headquarters from Restatement § 150 but that other factors should be considered "in light of the [seven] choice-of-law principles stated in [Restatement] § 6" (quoting Restatement § 150 cmt. b)); Restatement § 187 (pointing courts to § 188, which contains five factors, only one of which includes the domicile or place of business of the parties).

18

and weighs whether Illinois' interests are "materially greater" than Delaware's.[61]

Cytotheryx and Swart point out that Illinois courts apply an "innocent construction" rule to defamation claims,[62] under which a statement will not be defamatory *per se* "if it is reasonably capable of an innocent construction."[63] That rule might be considered a "fundamental public policy," because it relates to "constitutional interests of free speech and free press."[64] On the other hand, the rule has not been codified by Illinois statute, which weighs against the conclusion that it is "fundamental."[65]

Whether the "innocent construction" rule is fairly labeled as "fundamental" to Illinois public policy, however, is not dispositive, because Illinois does not have a materially greater interest in this dispute than Delaware. This is not a case about speech only, or even mostly, in Illinois; rather, it is about speech published on the

---

[61] *See Sycamore*, 2021 WL 761639, at *9-10 (considering whether there is a "fundamental public policy" at play and a "materially greater" interest together).

[62] *See* Op. Br. at 9-10; Reply at 4-5.

[63] *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006) (citations omitted). Even if the innocent construction rule would apply to an action for defamation *per se*, a plaintiff could still proceed under a defamation *per quod* theory, which in Illinois requires the plaintiff to plead special damages. *Id.* at 127.

[64] *Id.*

[65] *See id.* at 121 (explaining that the rule "originated in Illinois from *obiter dictum*" in a 1962 Illinois Supreme Court opinion); *Sycamore*, 2021 WL 761639, at *9 (explaining that Delaware courts have been more likely to consider a foreign state policy "fundamental" when the foreign state "clearly articulates its judgments and concerns by statute" (citations omitted)).

internet to "millions" throughout the country.[66]   There is no allegation that Cytotheryx or Swart wrote the press release in Illinois.  The relevant speech is about a contractual dispute in a Delaware court under Delaware law.  The dispute arises from a transaction between entities that chose Delaware as their corporate homes concerning the sale of another Delaware entity.  Illinois' interest in this dispute is based only on the domicile of one Counterclaimant with no suggestion that the speech at issue was particularly directed at that domicile.  Accordingly, Illinois does not have a "materially greater" interest in this dispute than Delaware, and Delaware law applies.

### B.    COUNTERCLAIMANTS HAVE STATED A CLAIM FOR DEFAMATION.

With the applicable law settled, the Court now applies it to determine if the Counterclaims meet the pleading standard.  To state a claim for defamation under Delaware law, a claimant must allege: (1) the defendant made a defamatory statement, (2) concerning the claimant, (3) the statement was published, and (4) a third party would understand the character of the communication as defamatory.[67]

---

[66] *See* Counterclaims ¶¶ 11-12, 18.

[67] *Isaac v. Politico LLC*, --- A.3d ----, 2025 WL 2437093, at *8 (Del. Aug. 25, 2025) (citing *Page v. Oath Inc.*, 270 A.3d 833, 842 (Del. 2022)).

Cytotheryx and Swart do not dispute that they made statements concerning Counterclaimants published in the press release. The motions thus concern only the fourth element and two related defenses.[68]

### 1. THE PRESS RELEASE IS REASONABLY SUSCEPTIBLE TO A DEFAMATORY MEANING.

"A statement is defamatory when it 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'"[69]

Reading the press release in the light most favorable to Counterclaimants, it is susceptible to a defamatory meaning. The press release accuses Counterclaimants of making "misrepresentations" during negotiations.[70] A person could reasonably

---

[68] "[D]efamation consists of the 'twin torts' of libel and slander." *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978) (citation omitted). Libel is written defamation, while slander is oral defamation. *Id.* Because it is based on the written statements in the press release, this is a case for libel. *See, e.g.*, Counterclaims ¶¶ 22-23, 27, 35-36, 40. The Counterclaims contain counts for both "Defamation *per se*" and "Defamation." *See id.* ¶¶ 21-41. Some jurisdictions distinguish between libel *per se* and libel *per quod*, requiring plaintiff to prove "special damages" for the latter but not the former. *See Spence*, 396 A.2d at 970-71. Delaware does not make this distinction and does not require proof of special damages for any libel. *Id.* at 971. The pleading standard for both counts in the Counterclaims is thus the same and, accordingly, the Court analyzes both counts together.

[69] *Cousins v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022) (quoting Restatement of Torts § 559 (Am. Law Inst. 1938)).

[70] Counterclaims, Ex. C (referencing "[t]he misrepresentations provided during the acquisition process by Castle Creek and Paragon Biosciences' leadership teams").

21

perceive this statement as asserting that Counterclaimants lied during the negotiations, which is sufficient to support a libel case.[71]

The press release can also be read as libelous due to its statement that Counterclaimants' "misrepresentations" and "refusal to provide payment under the contract terms, is not consistent with the actions of a financially stable company who adheres to their contractual obligations."[72] There are two reasonable interpretations of this statement that are sufficient to plead libel. First, it may be read to suggest that Counterclaimants are financially stable, yet did not pay their debts due under the contract—in other words, that they could have paid their debts, but chose not to.[73] Second, the press release could be read as charging Counterclaimants with being financially unstable. This could be defamatory if false, as it may deter potential business partners or suppliers, fearful of not being paid, from doing business with Counterclaimants.[74]

---

[71] *Q-Tone Broad., Co. v. Musicradio of Md., Inc.*, 1994 WL 555391, at *7 (Del. Super. Aug. 22, 1994) (holding that accusations of lying supports a *prima facie* case for libel).

[72] Counterclaims, Ex. C.

[73] *Rice v. Simmons*, 2 Del. (2 Harr.) 417, 426-27 (Del. 1838) ("[H]e who will not pay his debts though able, cannot be regarded as an honest man; and the written charge of such *villainy* would in my opinion, amount to a libel; because the inevitable effect would be to degrade him in society."), *cited favorably by Spence*, 396 A.2d at 971-72.

[74] *See* Counterclaims ¶¶ 18-19 (alleging press release was distributed to "those within the biosciences trade, such as Counterclaimants' potential and actual customers and business partners," and that it "paints a *false* picture to the public and the biosciences trade that the Counterclaimants are financially unstable and lack business integrity").

22

Accordingly, a third party could understand the statements in the press release to be defamatory, and Counterclaimants have stated a claim for libel.

### 2. THE PRESS RELEASE STATEMENTS ARE NOT INACTIONABLE OPINIONS.

Cytotheryx and Swart attempt to avoid this conclusion by arguing that their statements are inactionable opinions. A statement is not actionable if it is a "pure expression[] of opinion."[75] Whether a statement is an opinion is a question of law.[76] The Court considers four factors to determine if a statement is an opinion: (1) the common usage or meaning of the challenged language, (2) whether the statement can be objectively verified as true or false, (3) the full context of the statement, and (4) the broader social context into which the statement fits.[77]

On the first factor, Counterclaimants challenge language asserting that they made "misrepresentations" during the acquisition process and refused "to provide payment under the contract terms" and that those actions are "not consistent with the actions of a financially stable company who adheres to their contractual obligations."[78] As explained above, that language suggests that Counterclaimants

---

[75] *Riley v. Moyed*, 529 A.2d 248, 251 (Del. 1987) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)).

[76] *Id*. (citing *Slawik v. News-Journal Co.*, 428 A.2d 15, 17 (Del. 1981)).

[77] *Id*. at 251-52 (citing *Ollman v. Evans*, 750 F.2d 979-85 (D.C. Cir. 1984)).

[78] Counterclaims, Ex. C.

lied during the acquisition process and are either not willing to pay their debts or not a financially stable company.

On the second factor, whether Counterclaimants lied or are financially stable are objectively verifiable facts. Although there may be some uncertainty as to what "financially stable" means in this context, the statement can reasonably be read to "impl[y] the allegation of undisclosed defamatory facts" about Counterclaimants' financial condition.[79]

On the third factor, the context of the press release does not support a finding that these statements are opinions. The press release concerns litigation, which might imply that the statements are mere litigation positions rather than facts, but it makes assertions beyond just summarizing Cytotheryx's litigation allegations. Had Cytotheryx and Swart stuck to making assertions in Court filings, those assertions may have been protected as privileged, but that protection does not extend to "statements made outside of the course of [the] judicial proceedings," such as in a press release.[80]

---

[79] *See Riley*, 529 A.2d at 251.

[80] *See Barker v. Huang*, 610 A.2d 1341, 1345 (Del. 1992) (describing the "absolute privilege" that "protects from actions for defamation statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial proceeding and were relevant to a matter at issue in the case" (citation omitted)).

On the fourth factor, the Counterclaims identify the broader social context as including "the biosciences trade" and Counterclaimants' "potential and actual customers and business partners" who may have seen the press release.[81] Cytotheryx and Swart provide no reason to believe that their statements would be considered opinions in this context any more than in others.

These factors, therefore, do not support a finding that the challenged statements are inactionable opinions.

### 3. IT IS TOO EARLY TO DETERMINE IF THE STATEMENTS IN THE PRESS RELEASE ARE TRUE.

Finally, Cytotheryx and Swart argue that the press release's statements are inactionable because they are "substantially true."[82] "[I]t is a rare case that may be dismissed under Rule 12(b)(6) on the rationale that the statements complained of are substantially true."[83] On the motion to dismiss its claims, this Court assumed the allegations in Cytotheryx's complaint were true and drew all reasonable inferences in Cytotheryx's favor. But Cytotheryx is not entitled to those assumptions and inferences at this time. The time to determine the truth of the press release's statements will come after the parties have taken discovery and have the chance to prove their cases.

---

[81] *See* Counterclaims ¶ 18.

[82] *See* Reply at 14.

[83] *Ramunno*, 705 A.2d at 1036.

25

*       *       *

Counterclaimants have pled claims for defamation under Delaware law. Cytotheryx's motion to dismiss under Rule 12(b)(6) is therefore **DENIED**.

### C.     THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER SWART.

Even if the Counterclaims state a claim, they cannot proceed against a party over whom the Court does not have personal jurisdiction. Swart contends that this Court lacks jurisdiction over him and seeks dismissal on that basis.

Counterclaimants bear the burden of showing, first, a statutory basis for jurisdiction and, second, jurisdiction comports with due process.[84] If either is lacking over a particular party, the Court must dismiss that party for lack of personal jurisdiction.[85] Where, as here, "no evidentiary hearing has been held, [claimants] need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the [claimants].'"[86]

---

[84] *Terramar Retail Ctrs.*, 2017 WL 3575712, at *4-5.

[85] *Id.* at *5.

[86] *Ryan*, 935 A.2d at 265 (citations omitted).

26

### 1. STATUTORY BASES FOR JURISDICTION

Counterclaimants contend that the Court has statutory jurisdiction over Swart under either Delaware's Long-Arm Statute[87] or its Officer Consent Statute.[88] The Court examines each statute below.

### a. THE LONG-ARM STATUTE

Counterclaimants argue that jurisdiction arises under the Long-Arm Statute because the press release was issued on a website that "organizes press releases by state and has a category for Delaware," as well as because the Press Release discusses this Delaware lawsuit and Court.[89] This argument fails.

For 10 *Del. C.* § 3104(c)(3) to provide the necessary jurisdictional hook, Delaware law requires that (1) the non-resident defendant caused a tortious injury in Delaware and (2) such injury was due to an act or omission by the defendant in Delaware.[90] Here, the second prong is dispositive.

For the second prong of Section 3104(c)(3) to be satisfied, Delaware courts require that an individual be physically present in Delaware while making defamatory statements.[91] In a 1984 case that is the analog equivalent of this digital

---

[87] 10 *Del. C.* § 3104(c)(3).

[88] 10 *Del. C.* § 3114(b); *see* Ans. Br. at 23-27.

[89] *See* Ans. Br. at 25-27.

[90] *Rotblut v. Terrapin, Inc.*, 2016 WL 5539884, at *5 (Del. Super. Sept. 30, 2016).

[91] *See, e.g., Ciabattoni v. Teamsters Local 326*, 2016 WL 4442277, at *5-6 (Del. Super. Aug. 22, 2016); *Ramada Inns, Inc. v. Drinkhall*, 1984 WL 247023, at *2-3, *5 (Del. Super.

case, the Superior Court held that it did not have personal jurisdiction over two *Wall Street Journal* writers.[92]  There, plaintiff filed a libel suit against *The Wall Street Journal's* parent company and the two non-resident journalists for an article they wrote.[93]  The Court determined that it lacked jurisdiction over the journalists because they did not write the article in Delaware and had nothing to do with the distribution of the article in Delaware by the parent company.[94]

More recently, the Superior Court reiterated this position in the context of defamatory Facebook posts, holding that it lacked jurisdiction because the plaintiff failed to show "that the [Facebook] posts . . . were 'initiated' while Defendant . . . was in Delaware."[95]  The United States District Court for the District of Delaware takes a similar approach as well.[96]

---

May 17, 1984); *see also Joint Stock Soc'y "Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court" v. Heublein, Inc.*, 936 F. Supp. 177, 193-94 (D. Del. 1996).

[92] *Ramada*, 1984 WL 247023, at *1-3, *5.

[93] *Id*. at *1.

[94] *Id*. at *5.

[95] *See Ciabattoni*, 2016 WL 4442277, at *4-6 (citing *Kabbaj v. Simpson*, 2013 WL 2456108, at *6 (D. Del. June 6, 2013)).

[96] *See, e.g.*, *Joint Stock Soc'y*, 936 F. Supp. at 193-94 ("In order for a defendant to commit an act in Delaware and be subject to subsection (c)(3) of the Delaware long-arm statute, the defendant, or an agent of the defendant, must be present in Delaware when the deed is done. . . .  The fact that recipients of the bid letter and the press release republished the allegedly defamatory statements in Delaware does not alter this conclusion." (citations omitted)).

To argue for a different result, Counterclaimants rely on a recent decision from the Superior Court.[97] In *Owens v. Lead Stories, LLC*, media personality Candace Owens sued Facebook's factchecking company for placing allegedly defamatory "warnings"—in the form of links to fact-checking stories on the company's website—on Owens's posts.[98] In determining the court's personal jurisdiction over the fact-checking website under the Long-Arm Statute, the court analyzed the "level of interactivity and commercial nature of the exchange of information that occurs on the website."[99] Counterclaimants similarly argue for personal jurisdiction here based on the "interactivity" of EIN Presswire, where Cytotheryx and Swart posted the press release.[100]

*Owens* is distinguishable. It highlights the difference between personal jurisdiction over a website operator, as in *Owens*, and an individual who wrote a statement that appears on a website, as here. In *Owens*, the plaintiff sued the website operator, not the writers, and the Court therefore analyzed the interactivity of the operator's website to determine jurisdiction.[101] That is not this case, where

---

[97] Ans. Br. at 26.

[98] 2021 WL 3076686, at *2 (Del. Super. July 20, 2021).

[99] *Id*. at *6-7.

[100] Ans. Br. at 26.

[101] *Owens*, 2021 WL 3076686, at *7.

29

Counterclaimants are suing Swart, not EIN Presswire. Thus, the Court's jurisdiction over Swart does not turn on the level of interactivity of EIN Presswire's website.

Counterclaimants do not allege that Swart made any alleged defamatory statement while physically present in Delaware. Accordingly, they have not made a *prima facie* showing that the Long-Arm Statute applies to exercise personal jurisdiction over Swart.

### b. THE OFFICER CONSENT STATUTE

In the alternative, Counterclaimants contend that jurisdiction arises under the Officer Consent Statute.[102] That statute applies to Swart here.

Under 10 *Del. C.* § 3114(b), a nonresident officer of a Delaware corporation consents to the exercise of personal jurisdiction in Delaware courts in two types of cases: "(i) 'all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such officer is a necessary or proper party;' or (ii) 'any action or proceeding against such officer for violation of a duty in such capacity.'"[103] Counterclaimants argue that jurisdiction arises under the first prong because Swart is a proper party to this litigation.[104]

---

[102] *See* Ans. Br. at 23-25.

[103] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 277 (Del. 2016) (quoting 10 *Del. C.* §3114(b)).

[104] Ans. Br. at 25.

"A party is a 'necessary' party if her rights must be ascertained and settled before the rights of the parties to the lawsuit can be determined. A party is 'proper' if she has a 'tangible legal interest in the matter' separate from the corporation's, and if the claims against her arise out of the same facts and occurrences as the claims against the corporation."[105]

Swart is a proper party. He has a "tangible legal interest in the lawsuit" separate from Cytotheryx because the defamation claims are brought against him individually, while arising out of the same set of alleged facts as the claims against Cytotheryx.[106] It is that straightforward.

The Officer Consent Statute thus provides a statutory basis for jurisdiction. But the analysis does not end there; exercising jurisdiction over Swart must satisfy due process as well.

### 2. DUE PROCESS

In interpreting the Officer Consent Statute, the Delaware Supreme Court has recognized that the "necessary or proper party" prong could be overly broad in some cases.[107] As a check against that possibility, Delaware courts must also undertake a

---

[105] *BAM Int'l, LLC v. MSBA Grp. Inc.*, 2021 WL 5905878, at *9 (Del. Ch. Dec. 14, 2021) (first quoting *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *8 (Del. Ch. Mar. 28, 2018); and then citing *Hazout*, 134 A.3d at 292).

[106] *Id.*

[107] *See Hazout*, 134 A.3d at 291.

due process analysis.[108] The Court applies the *International Shoe* "minimum contacts" test when analyzing due process.[109] The focus of the inquiry is whether the defendant "engaged in sufficient 'minimum contacts' with Delaware" such that requiring her to defend herself here is "consistent with the traditional notions of fair play and justice."[110]

Delaware courts evaluate several factors in the minimum contacts analysis for non-resident corporate officers. These include: (1) whether the claimant asserts causes of action under Delaware law; (2) whether the acts giving rise to the causes of action occurred in Delaware; (3) whether the defendant resides, is incorporated in, or has its principal place of business in Delaware; (4) the types of claims being asserted (i.e., whether they are tort or contract or those affecting the internal affairs of corporate governance); (5) whether the claimant is asserting causes of action against the officer for acts taken in her official capacity; (6) whether the underlying transaction giving rise to the claims involves a change of corporate control; (7) if a contract governs the underlying transaction, whether it contains a Delaware choice-of-law provision; and (8) whether Delaware entities were formed for the purposes

---

[108] *Id.*

[109] *Li v. Xu-Nuo Pharma, Inc.*, 2022 WL 17588101, at *3 (Del. Super. Dec. 13, 2022) (citing *Hazout*, 134 A.3d at 278).

[110] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)).

of facilitating the wrongdoing.[111] This is not an exhaustive list. Courts take a holistic approach to the analysis, such that no one factor is dispositive.

Under these factors, the Court finds that it lacks jurisdiction over Swart. First, the defamation claims are asserted under Delaware law, as discussed above. Second, there is no allegation that Swart made the allegedly defamatory statements while in Delaware. Third, Swart does not reside in Delaware. Fourth, defamation is a tort, not a claim concerning corporate governance. Fifth, Counterclaimants maintain the defamation claims are being asserted against Swart personally for actions taken in his capacity as CEO, and the press release quotes him as "Cytotheryx President and CEO."[112] They have not, however, alleged that he misused his corporate position or that he breached any of his fiduciary duties. Sixth, the underlying merger involves a Delaware entity changing hands between two other Delaware entities. Seventh, the Merger Agreement contains a Delaware choice-of-law provision, though Swart is not a party to that agreement. Finally, no Delaware entity was created for the purposes of committing the defamation. Thus, some factors weigh in favor of jurisdiction, others against.

---

[111] *See, e.g.*, *Hazout*, 134 A.3d at 292-94; *BAM Int'l*, 2021 WL 5905878, at *9-11; *Turf Nation, Inc. v. UBU Sports, Inc.*, 2017 WL 4535970, at *9 (Del. Super. Oct. 11, 2017).

[112] Counterclaims ¶ 15; Counterclaims, Ex. C.

33

The balance in this case, though not exactly the same, is similar to other tort cases where Delaware courts have found personal jurisdiction lacking.[113] Of the factors that address Swart's actions, none indicate any contacts with Delaware. Swart does not live in Delaware, did not make statements in Delaware, is not being sued for a breach of his fiduciary duties, and did not create a Delaware entity through which he made any statements. Accordingly, the Court holds that Swart lacks sufficient minimum contacts with Delaware such that it cannot exercise personal jurisdiction over him. Because exercising jurisdiction over Swart would not satisfy the due process clause of the Fourteenth Amendment, Swart's motion to dismiss under Rule 12(b)(2) is **GRANTED WITHOUT PREJUDICE**.[114]

---

[113] *See, e.g., Li*, 2022 WL 17588101, at *4 (declining jurisdiction because tortious interference claim against non-resident "sounds in tort, does not implicate corporate governance practices, and . . . asserts alleged acts taken in his personal capacity"); *BAM Int'l*, 2021 WL 5905878, at *10-11 (declining jurisdiction where alleged harms "sound in tort" and neither concern "fiduciary duties" nor "implicate corporate governance practices," though Delaware law governed by contract); *Turf Nation*, 2017 WL 4535970, at *9 (declining jurisdiction where relevant acts occurred, claims were brought, and parties' principal places of business were out-of-state, even though entities were incorporated in Delaware).

[114] In the alternative, Counterclaimants request that they be permitted to take jurisdictional discovery. *See* Ans. Br. at 28. To the extent Counterclaimants seek a separate, expedited discovery process, this request is denied. However, discovery will proceed in this case, including on the defamation claims. Given that Swart is Cytotheryx's CEO and is quoted in the press release, it seems likely he will participate in discovery. The Court has granted the Rule 12(b)(2) motion without prejudice, primarily so that Counterclaimants may bring any valid claims in a forum that has jurisdiction, should they choose to do so. If, however, the general discovery process in this case reveals facts to support jurisdiction over Swart, the Court will not preclude Counterclaimants from revisiting jurisdiction here.

**D.     THE COURT DECLINES TO STAY THE COUNTERCLAIMS.**

Last, as an alternative to dismissal, Cytotheryx and Swart request that the Court stay the Counterclaims until after Cytotheryx's own claims are resolved.[115] That request is **DENIED**.

Trial courts have "broad discretion to manage their dockets, including by staying litigation on the basis of . . . efficiency."[116]  Exercising this discretion, the Court declines to stay the Counterclaims.  As Cytotheryx and Swart acknowledge, there is likely overlap between the evidence and proof that will be required for Cytotheryx's claims and the Counterclaims.[117]   If the Court knew now that Cytotheryx will prove its claims, a stay may be efficient.  But the Court cannot predict that at this stage and, accordingly, determines that the more efficient path is to permit the overlapping claims in this action to proceed together.

---

[115] *See* Op. Br. at 29.

[116] *Havens v. Leong*, 272 A.3d 781 (Del. 2022) (TABLE).

[117] *See* Op. Br. at 29 (suggesting that the defamation claims "may become moot or otherwise [be] impacted by the outcome of the primary dispute").

35

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS WITHOUT PREJUDICE** Swart's motion to dismiss (D.I. 33) for lack of personal jurisdiction and **DENIES** Cytotheryx's motion to dismiss or stay (D.I. 31).

**IT IS SO ORDERED.**

/s/ *Patricia A. Winston*
**Patricia A. Winston, Judge**